*393 GILBERTSON, Chief Justice.
[¶ 1.] Western Consolidated Cooperative (WestCon) sued Lynn Pew for conversion of grain he stole and sold to LaBolt Farmers Grain Company (LaBolt). West-Con also sued LaBolt for conversion for its role in purchasing the stolen grain from Pew. After discovery, WestCon’s motion for summary judgment was granted and the circuit court ordered judgment jointly and severally against Pew and LaBolt. LaBolt appeals, arguing that its lack of knowledge about Pew’s theft provided it with a defense against liability, or in the alternative, served to reduce proportionally its share of the damages payable to WestCon. LaBolt also argues that West-Con failed to mitigate its damages. We affirm in part and reverse in part and remand.
FACTS
[¶ 2.] WestCon is a Minnesota cooperative with a grain elevator in Milbank, South Dakota. WestCon purchased the grain elevator from Harvest States in January 2003. In the final three years Harvest States owned the elevator, it employed Pew on a contract basis to be its lead grain hauler. Pew would make one or more trips from the elevator a day using his own semi-truck. When the elevator was sold to WestCon, Pew lost that job because WestCon had its own truckers. Pew never worked for the grain elevator after ownership was assumed by WestCon.
[¶ 3.] Beginning in mid-January 2003, after the sale to WestCon, and through January 2005, Pew surreptitiously stole grain from the WestCon grain elevator one truckload at a time and sold it in his name. Pew was able to steal the grain during the early morning hours when the elevator was unattended. Pew testified that when he stole the grain he would pull up to the elevator early in the morning around 5:30 a.m., fill his semi-truck, and leave. Given his prior relationship with Harvest States, the sight of Pew filling his semi-truck with grain was nothing out of the ordinary. Also due to that relationship, Pew was skilled at loading his semi-truck from the storage facility. Pew testified he could fill his semi-truck in a few minutes and be on his way.
[¶4.] Pew stated he found the grain elevator unlocked all but about a dozen times during the two years he stole grain.[1] By the time Pew was apprehended, the shortage totaled 89,000 bushels taken in approximately 100 loads during the two-year period he perpetrated the thefts. By taking the grain one truckload at a time (approximately 950 bushels per truckload), during this two-year time period, Pew was able to avoid alerting WestCon to outside theft as the source of its losses.
[¶ 5.] WestCon became aware of shortages at its Milbank facility in January 2003. Chad Syltie, WestCon’s credit manager who was assigned the task of determining the cause of the shortages, originally thought it was due to shrinkage or a miscount until March 2003 when the shortage grew to an estimated 22,000 bushels of grain. Early in the two-year scheme, WestCon did not identify outside theft as the source of the shortages because of the amount taken each time and because it had standard procedures in place to detect *394 such thefts. Those policies were, according to Syltie’s testimony, common for area silos.
[¶ 6.] WestCon’s theft and shortage detection procedures included conducting a physical inventory each month and locking the gravity chutes on its two silos. It also maintained a running total for the grain in the silos using daily computer-generated position reports based on daily purchases and outbound shipments. Because grain has a shrinkage factor of two-to-three percent at any given time, the shortages in the first three months did not alert West-Con to any irregularities.
[¶ 7.] Once WestCon’s management realized shrinkage was not the source of the shortages, its next theory was that the inventory it purchased in January 2003 from Harvest States was either miscalculated or understated. Over the course of a few months, Syltie was able to verify that Harvest States had measured its inventory correctly before the time of the sale and that no understatement had occurred.
[¶ 8.] On May 5, 2003, Mick Johnson, WestCon’s manager, reported the shortage to the Milbank Police Department during an investigation into an unrelated break-in of WestCon’s office area. According to Police Chief Tim Kwasniewski, Johnson laid out a scenario similar to the one used by Pew in which Johnson theorized that the grain could be stolen one truckload at a time using the gravity fed chutes on the silos. According to Kwasniewski, Johnson stated that all the thief would need was the key to the padlock on the silo chutes. Kwasniewski would later attest that it was his impression that Johnson suspected something criminal in nature was occurring. Kwasniewski agreed to have patrol cars make additional checks on the West-Con elevator after hours. Kwasniewski’s affidavit did not identify whether Johnson suspected an internal or external thief was at work. However, according to Syltie’s testimony, WestCon still continued to suspect employee theft or fraud as of May 2003. As a result, WestCon did not request additional police intervention. Instead, it continued to direct employees to lock the silo chutes at night.
[¶ 9.] Syltie next focused his investigation on an employee who had transitioned from Harvest States to WestCon after the sale and then abruptly quit a few months later. That employee’s background, work, and role at the facility were investigated. However, the employee was found to have no role in the shortages. Other employees were also considered during the on-going investigation, but none were determined to be involved.
[¶ 10.] WestCon subsequently theorized that perhaps one or more of its customers were either miscalculating or purposely understating inbound loads. When that did not provide any answers, West-Con investigated its outbound truckers who transported all of its grain from Mil-bank to Minnesota for loading onto rail-cars. Again, no thefts or discrepancies were found.
[¶ 11.] All of WestCon’s efforts to ascertain the source of the shortages were unsuccessful and each took several months to resolve. WestCon did not originally consider an outside thief due to the location of the Milbank facility. The elevator, located inside city limits, had no history of prior thefts according to Harvest States. As Syltie testified: “[they had] never [had] a theft like this before, and it took everyone by surprise.” He also testified that he was unaware of any other security measures taken by other elevators in the area to protect against this kind of loss apart from those utilized by WestCon.
[¶ 12.] Finally, after the elimination of the other possible causes of the shortages, *395 WestCon concluded in summer 2004 that the source of the losses was likely a thief external to its operation. Thereafter, WestCon changed the locks on the silos on a monthly basis. When the shortages continued to mount, it changed the locks weekly in November and early December.[2] In fall 2004, WestCon contacted the police department to conduct still camera surveillance. In early December, the police department’s camera photographed a suspect. However, the camera was not at the right angle to identify the thief. WestCon changed the locks once again and the camera was repositioned.
[¶ 13.] On January 10 and January 18, 2005, Pew was caught on camera loading grain. Pew was apprehended in the process of accessing the elevator for a third time on January 19, 2005. Pew was charged criminally in federal court and eventually pleaded guilty.[3]
[¶ 14.] WestCon’s total losses were estimated at $726,000. Defendant LaBolt purchased 82,370.87 bushels of WestCon grain from Pew between March 1, 2003, and December 7, 2004. LaBolt’s check register for this period showed it paid Pew $424,334.05 for the grain. LaBolt did not inquire as to the ownership of the grain sold by Pew. LaBolt also had no way of knowing to whom the grain belonged at the time of purchase.
[¶ 15.] In addition to the 82,370.87 bushels sold to LaBolt, Pew estimated that he sold 30% of all the WestCon grain he stole to Wheaton-Dumont, and 10,500 bushels of stolen corn to Northern Lights Ethanol, LLC. In addition, David Hanson, a friend of Pew’s and his part-time employer, reported a shortage of 9,000 bushels of grain from his silos to the Milbank police. Hanson suspected Pew had stolen the grain while working on Hanson’s property.
[¶ 16.] Upon Pew’s arrest, WestCon recovered $51,093.36 in soybeans from La-Bolt’s facility. WestCon also recovered a cashier’s check for $6,850 for stolen grain sold by Pew. In addition, WestCon recovered various items of personal property from Pew and his wife, Lynette Pew, valued at approximately $85,255.
[¶ 17.] WestCon sued Pew for conversion of the grain. WestCon moved to join LaBolt and Lynette Pew. WestCon amended its complaint to allege LaBolt was liable to WestCon for conversion by purchasing WestCon’s grain from Pew. WestCon also claimed that Lynette Pew was liable to WestCon for conversion because she retained proceeds from the sale of stolen grain. LaBolt filed a cross-claim against Pew and Lynette Pew for indemnity and contribution.
[¶ 18.] WestCon moved for summary judgment against all defendants. LaBolt objected and asserted genuine issues of material fact existed on the issue of damages and LaBolt’s defenses. After a hearing, the circuit court ordered summary judgment in favor of WestCon against La-Bolt and Pew jointly and severally in the amount of $424,334.05. The circuit court also ordered $143,198.36 as a credit against the judgment, or other sums as the parties might agree or as might be deter *396 mined by the circuit court for property and money previously recovered by WestCon. LaBolt appeals, raising three issues:
1. Is there a genuine issue of material fact as to whether LaBolt’s interference was “unwarranted.”
2. Is there a genuine issue of material fact as to LaBolt’s proportion of fault for purposes of applying the Uniform Contribution Among Tort-feasors Act, SDCL 15-8-15, -15.1, and -15.2.
8. Are there genuine issues of material fact as to the amount of damages WestCon may be entitled to recover.
STANDARD OF REVIEW
[¶ 19.] Our standard of review for a motion for summary judgment is settled.
Summary judgment is authorized “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.” We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.
Discover Bank v. Stanley, 2008 S.D. 111, ¶ 16, 757 N.W.2d 756, 761-62 (quoting Mueller v. Cedar Shore Resort, Inc., 2002 S.D. 38, ¶10, 643 N.W.2d 56, 62). Furthermore,
[wjhile we often distinguish between the moving and non-moving party in referring to the parties’ summary judgment burdens, the more precise inquiry looks to who will carry the burden of proof on the claim or defense at trial. Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.
De Smet Farm Mut. Ins. Co. of S.D. v. Gulbranson Dev. Co., Inc., 2010 S.D. 15, ¶ 16, 779 N.W.2d 148, 155 (quoting Zephier v. Catholic Diocese of Sioux Falls, 2008 S.D. 56, ¶ 6, 752 N.W.2d 658, 662-63).
[¶ 20.] Statutory interpretation is an issue of law that this Court reviews under the de novo standard. Discover Bank, 2008 S.D. 111, ¶ 15, 757 N.W.2d at 761 (citing Martinmaas v. Engelmann, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611). The true intention of the law is ascertained primarily from the language in the statute. Id. “When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court’s only function is to declare the meaning of the statute as clearly expressed.” Id.
ANALYSIS AND DECISION
[¶ 21.] 1. Is there a genuine issue of material fact as to whether LaBolt’s interference was “unwarranted.”
[¶ 22.] “Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner’s right in the property or in a manner inconsistent with such right.” First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31 (quoting Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 20, 652 N.W.2d 756, 766). In Rensch v. Riddle’s Diamonds of Rapid City, Inc., 393 N.W.2d 269, 271 (S.D.1986), we quoted Poggi v. Scott, 167 Cal. 372, 375, 139 P. *397 815, 816 (1914), for the following proposition:
The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.
(Emphasis added.) Furthermore, in order to prove conversion, the plaintiff must show
(1) [plaintiff] owned or had a possessory interest in the property; (2) [plaintiffs] interest in the property was greater than the [defendant’s]; (3) [defendant] exercised dominion or control over or seriously interfered with [plaintiffs] interest in the property; and (4) such conduct deprived [plaintiff] of its interest in the property.
First Am. Bank & Trust, N.A., 2008 S.D. 83, ¶ 38, 756 N.W.2d at 31.
A. LaBolt argues there is evidence questioning WestCon’s ownership of the grain.
[¶ 23.] LaBolt argues that there is evidence questioning whether all the grain it purchased from Pew belonged to WestCon. There is some evidence that Pew may have stolen 9,000 bushels of grain from his part-time employer, Hanson. However, there is no evidence that Hanson’s grain, if converted by Pew, was purchased by LaBolt.
[¶ 24.] WestCon offered LaBolt’s check register as an exhibit showing it paid Pew $424,334.05 for grain delivered by Pew. It was undisputed that Pew did not farm and had no grain to sell. Pew testified that all the grain he sold was stolen from West-Con.
[¶ 25.] LaBolt objected to WestCon’s statement of undisputed facts that LaBolt had purchased $424,334.05 in grain stolen exclusively from WestCon. LaBolt, however, did not include in its statement of disputed facts any allegation as to the ownership of the $424,334.05 in grain it purchased. At best, LaBolt suggested it may have purchased some or all of the 9,000 bushels of grain Hanson reported might have been stolen by Pew. LaBolt admitted in its statement of disputed facts that it had “no evidence that the grain was owned by anyone else.”
[¶ 26.] Offering only argument while failing to offer contradictory evidence cannot defeat a prima facie showing by a plaintiff. Fin-Ag, Inc. v. Pipestone Livestock Auction Mkt., Inc., 2008 S.D. 48, ¶ 37, 754 N.W.2d 29, 44. LaBolt failed to offer anything other than argument as to the ownership of the grain it purchased. WestCon provided evidence and testimony sufficient to make a prima facie showing that LaBolt converted $424,334.05 of the $726,000 in grain Pew stole from WestCon. The prima facie showing by WestCon went unrebutted by LaBolt.
B. Whether LaBolt’s control over the grain was “wrongful” or “unwarranted.”
[¶ 27.] LaBolt next argues that the language in SDCL 21-3-3 only permits damages for wrongful conversion. It further contends that the circuit court did not make a specific determination that La-Bolt’s control over the grain was wrongful. WestCon asserts that LaBolt misapplies the law of conversion in that there is no good faith defense to conversion as it is by definition “wrongful” under SDCL 21-3-3.
[¶ 28.] SDCL 21-3-3 provides how damages for conversion are calculated:
*398 The detriment caused by the turongful conversion of personal property is presumed to be:
(1) The value of the property at the time of the conversion, with the interest from that time;
(2) Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party;
(3) A fair compensation for the time and money properly expended in pursuit of the property.
Such presumptions cannot be repelled in favor of one whose possession was wrongful from the beginning by his subsequent application of the property to the benefit of the owner, without his consent.
(Emphasis added.)[4]
[¶ 29.] LaBolt argues that the use of the word wrongful in SDCL 21-3-3 required WestCon to show that LaBolt’s possession of the grain was wrongful or unwarranted. LaBolt further contends that it occupied the position of a good faith purchaser for value without knowledge or notice of WestCon’s rights in the grain. As such, LaBolt argues that it was a question for the jury whether LaBolt’s status limited liability or limited damages.
[¶ 30.] Our case law is clear that it is immaterial that a defendant who purchases goods from a seller who has converted those goods “had neither knowledge nor notice that the [seller] was committing a wrong by the sale.” Fin-Ag, Inc., 2008 S.D. 48, ¶ 34, 754 N.W.2d at 44 (citing Sanborn Cnty. Bank, Inc. v. Magness Livestock Exch., Inc., 410 N.W.2d 565, 567 (S.D.1987)). All that is required for a defendant/purchaser to be liable for conversion is that the defendani/purchaser exercised control or dominion over the personal property of another in a way that repudiated the other’s rights in the property or in a manner inconsistent with such rights. Id. The tort of conversion does not require the intent to deprive the true owner of his property rights. Rensch, 393 N.W.2d at 271 (“Intent or purpose to do a wrong is not a necessary element of proof to establish conversion.”). “It is immaterial that the agent had neither knowledge nor notice that the principal was committing a wrong by the sale.” Fin-Ag, Inc., 2008 S.D. 48, ¶ 34, 754 N.W.2d at 44. The use of the word “wrongful” in SDCL 21-3-3 does not add an element to the tort, or an additional element that must be satisfied in order to calculate damages once the defendant has been found liable for conversion. It is the act of conversion itself that is the wrong. Id. Thus, the language of the statute and its subsequent interpretative case law holds that as between the owner and the subsequent purchaser from the thief, the subsequent purchaser is to bear the consequences of the loss, not the original owner.
[¶ 31.] 2. Is there a genuine issue of material fact as to LaBolt’s proportion of fault for purposes of applying the Uniform Contribution Among Tortfea-sors Act, SDCL 15-8-15, -15.1, and -15.2.
[¶ 32.] LaBolt next argues that there is a genuine issue of material fact as to La-Bolt’s proportion of fault. LaBolt further asserts that because it did not act in concert with Pew to convert the grain, West-Con must show that LaBolt engaged in “wrongful conversion” before WestCon can *399 recover damages from LaBolt. LaBolt bases its argument on SDCL 21-3-3, which it again contends permits damages only for wrongful conversion.
[¶ 33.] SDCL 15-8-15 provides: “When there is such a disproportion of fault among joint tort-feasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tort-feasors shall be considered in determining their pro rata shares.” SDCL 15-8-15.1 provides:
If the court enters judgment against any party liable on the basis of joint and several liability, any party who is allocated less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.
SDCL 15-8-15.2 provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a proximate cause of the damages claimed and if the acts or omissions of such persons are so interrelated that it would be inequitable to distinguish between them.
[¶ 34.] As this Court has often noted:
The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court’s only function is to declare the meaning of the statute as clearly expressed.
Discover Bank, 2008 S.D. 111, ¶ 15, 757 N.W.2d at 761.
[¶ 35.] In order to impose joint and several liabilities upon the defendants, the circuit court was required under SDCL 15-8-15.1 and -15.2 to have the trier of fact determine LaBolt’s percentage' of fault, or to determine that LaBolt and Pew were to be treated as a single party. If the trier of fact determines that LaBolt and Pew are to be treated as a single party under SDCL 15-8-15.2, their respective conduct must be “so interrelated that it would be inequitable to distinguish between them.” If the trier of fact finds that the conduct of LaBolt and Pew are not so interrelated as to be able to distinguish between their respective conduct, then a percentage allocation of fault must be entered for each defendant by the trier of fact. Any defendant who is found by the trier of fact to be responsible for “less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.”
[¶ 36.] WestCon’s motion for summary judgment on the issue of damages was improperly entered. There is a genuine issue of material fact for the trier of fact regarding the percentage of fault that could be allocated to each defendant under SDCL 15-8-15.1 and -15.2. That portion of the order is vacated and the matter remanded to the circuit court for the trier of fact to determine the percentage of fault for each defendant, and entry of a new order on the issue of damages in *400 compliance with those two statutory provisions.
[¶ 37.] 3. Are there genuine issues of material fact as to the amount of damages WestCon may be entitled to recover.
[¶ 38.] LaBolt again states that there are genuine issues of material fact regarding whose grain Pew stole and to whom it was sold, this time in an effort to argue that WestCon’s damages were not “reasonably certain.” However, this argument was not presented to the circuit court below and is deemed waived. See State v. Engesser, 2003 S.D. 47, ¶ 32, 661 N.W.2d 739, 750.
[¶ 39.] LaBolt’s argument that West-Con failed to mitigate its damages was preserved below. LaBolt, citing Restatement (Second) Torts § 918(1)(1979), argues that WestCon failed to make reasonable efforts and expenditures to prevent its own losses. It argued before the circuit court that WestCon failed to take effective action to mitigate its damages at the time WestCon first suspected or became aware of the shortages in March 2003. WestCon countered that it was not required to mitigate until it discovered Pew was stealing grain in late December 2004 and early January 2005.
[¶ 40.] The circuit court disallowed the defense rather than finding there were disputed issues of material fact. The question before this Court is a legal one rather than a factual dispute. At issue is whether the mitigation of damages rule applies under the facts of this case. This is not a question of common law; it is one of statutory construction as it is controlled by SDCL 21-3-3, which has been in effect in this jurisdiction since 1877. Dakota Revised Civil Code §§ 1970, 1971 (1877). As such, the statute and its interpretative case law are what control the resolution of this issue.
[¶ 41.] Under SDCL 21-3-3 and its interpretative case law, WestCon is the victim of an on-going conversion by continual theft and is not required to anticipate that the theft will continue into the future. Even under an opposite legal conclusion that this is a series of individual thefts, the result is the same.
[¶ 42.] A review of our case law shows that application of the doctrine of mitigation to conversion of a plaintiffs property is very limited and, in those few circumstances where allowed, only recognized after the injury occurs. In the case of Rosum v. Hodges, 1 S.D. 308, 47 N.W. 140 (1890), this Court in its initial interpretation of SDCL 21-3-3 made a passing reference to a victim’s potential negligence. Id. at 142. However, this Court refined its analysis to recognize the unequivocal protection of the property rights of the victim unless he had qualified his right to the property or his right of immediate possession.[5] Id. Thus, the Court concluded that if the owner’s property right was established, no further mitigation defenses were recognized. This Court once again addressed the mitigation issue in a conversion action in Stone v. Chicago, M. & St. P. Ry. Co., 3 S.D. 330, 53 N.W. 189 (1892). *401 Therein we held that the victim of a conversion was limited to recoverable damages “commensurate with his actual loss ... and any facts which, if established by proof, will go toward a mitigation of damages, are competent evidence in a trial of an action of trover or conversion.” Id. at 191 (citations omitted). No additional mitigation theories were recognized as a defense.
[¶ 43.] Another claim for mitigation was rejected by this Court in Arneson v. Nerger, 34 S.D. 201, 147 N.W. 982 (1914). In Ameson, the defendant sought to diminish the claim for damages by tendering the disputed stock with the court after suit was initiated. Id. at 983. This Court observed that, “[a]fter the conversion of property has become complete, the wrongdoer cannot escape liability nor lessen the actual damage recoverable, by a tender back of the property.” Id. (quoting Dooley v. Gladiator Consol. Gold Mines & Milling Co., 134 Iowa 468, 109 N.W. 864 (1906)).
[¶ 44.] LaBolt relies heavily upon Security State Bank v. Benning, 433 N.W.2d 232 (S.D.1988), to support its thesis. However, LaBolt fails to acknowledge our limiting statement in Security State Bank that “[t ] his rule does not require respondent to anticipate the injury before it occurs but rather relates to an act or omission relating to the injury after it occurs.” Id. at 235 (emphasis all original).
[¶ 45.] This observation is taken from a more in-depth analysis of the mitigation issue in Chicago, Burlington & Quincy R.R. Co. v. Wheaton, 76 S.D. 467, 80 N.W.2d 868 (1957). There, the appellant built a dam that used the railroad right-of-way as a wall. Id. As time went on, the water had a deteriorating effect and weakened the railroad grade. Id. The dam ultimately burst due to high water and caused substantial damage to the grade. Id. The appellant argued that the railroad should have been aware of the existence of the dam and taken some affirmative action to mitigate its on-going damages from the water. Id. at 870. We rejected such a contention, noting that “It would seem to us that the duty to take the ... action that appellant claims respondent should have taken would primarily lie with appellant whose continuous trespass was the underlying cause of the injury to respondent’s property.” Id. at 870-71. While acknowledging the victim did have a duty to eliminate the injury and prevent further damages, we concluded that such a mitigation defense “does not require respondent to anticipate the injury before it occurs but rather relates to an act or omission relating to the injury after it occurs.” Id. at 871 (emphasis added).
[¶ 46.] Based on what case law we have, the facts of this case constitute a single on-going conversion, rather than a series of conversions. Therefore, under the cases cited above, the doctrine of mitigation does not apply. Pew’s thefts were part of a continuing plan or scheme, as demonstrated by the identical method he used in every theft and his repeated sale of the stolen grain to LaBolt. Pew’s uncon-tradicted testimony as to how he continually took the grain from WestCon is detailed earlier in this opinion. His method never varied. He always acted alone with the same truck, removing the same item— grain — from the same elevator, in the same amounts, at the same time of day, hauled on the same route directly to La-Bolt, and obtained payment in the same manner. Of the 100 loads taken, nothing was unique to distinguish one of the 100 loads from any other. It became such a continual process that when deposed in prison, Pew was not able to differentiate between the various thefts and did not even know the total number of loads he *402 had taken. He had to take the word of the attorneys for WestCon and LaBolt for that figure. Based on our case law, the facts of this case constitute a single on-going conversion rather than a series of conversions. Therefore, under the cases cited above, a mitigation defense does not apply.
[¶ 47.] Even if one accepts the contrary premise that this is a series of individual conversions, it still does not mean that an owner of property must clear himself or herself in a contested trial from failure to mitigate damage claims before or while the conversion was occurring. Such a contention has been considered and rejected by the Utah Supreme Court in Angelos v. First Interstate Bank of Utah, 671 P.2d 772 (Utah 1983). In Angelos, the plaintiff Dr. Angelos sought to recover funds embezzled from him by an assistant over an eleven-year period. 671 P.2d at 774. The office assistant forged Dr. Angelos’s signature on patient’s checks and deposited them into her personal account at First Interstate Bank (Bank). Id. On appeal, the Bank raised the mitigation of damages argument claiming that Dr. Angelos “as a reasonably prudent businessman, knew or reasonably should have known of the embezzlement by [the office assistant] before March of 1975 and before September of 1978.” Id. at 775. The Utah Supreme Court rejected Bank’s mitigation of damages argument on appeal. It held as a matter of law that the eleven-year embezzlement scheme was a series of wrongful acts and not one continuous act as contended by Bank. Id. at 777. “Under the doctrine of avoidable consequences [mitigation of damages], ‘one need never take steps in advance to avoid the consequences of a future threatened wrong ..but rather, need only avoid or minimize damages that arise out of a wrong that has already been committed.” Id. (quoting C. McCormick, McCormick on Damages § 37, at 137 (1935)). That court held that under the mitigation of damages rule, Dr. Angelos’s failure to discover the assistant’s embezzlement scheme did not preclude him from recovering for the subsequent embezzlement of funds because each act of embezzlement in the scheme was a separate wrongful act. Id. As such, the embezzlement of a check earlier in time did not trigger a duty on the part of the victim to stop the subsequent checks from being embezzled or risk a reduction in damages under the mitigation rule. Id.
[¶ 48.] In 1877, the Territorial Legislature made the decision when conversion occurred that as between an innocent victim and an innocent purchaser, the purchaser should sustain the loss as he could obtain no better title than the seller, who was a thief, possessed. See Dakota Revised Civil Code §§ 1970, 1971 (1877).[6] That statute, now codified at SDCL 21-3-3, has never been materially changed.
[¶ 49.] LaBolt’s argument would in essence alter the doctrine of conversion into a common-law negligence standard. Unless as a victim you were fortunate enough to be a one-time victim, in subsequent acts resulting in further losses you would have *403 to defend yourself against the claim, as stated in Angelos, that “as a reasonably prudent businessman, [you] knew or should have known of the embezzlement” — in other words you will have to litigate the issue that you were not con-tributorily negligent. Instead of promptly recovering your property, you would be forced to run the gauntlet of a jury trial with its delay and expense.
[¶ 50.] Further, in Rensch, we categorically rejected negligence tort concepts as applied to the conduct of a defendant in a conversion case:
The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.
393 N.W.2d at 271. Based on our case law cited above, the same standard should be applicable to the plaintiff in a conversion case.
[¶ 51.] SDCL 21-3-3 has never been materially amended and there is no reason to interpret it differently after 133 years. WestCon was not required to mitigate its damages until after it discovered Pew was stealing grain in late December 2004 and early January 2005.[7] Accordingly, the circuit court is affirmed on this issue.
[¶ 52.] Affirmed in part, reversed in part, and remanded.
[¶ 53.] SEVERSON, Justice, concurs.
[¶ 54.] ZINTER, Justice, concurs specially in part and concurs in result in part.
[¶ 55.] KONENKAMPand MEIERHENRY, Justices, concur in part and dissent in part.

. Pew’s deposition given in Federal Prison is inconsistent on this point. He initially said the silo was never locked. Pew then contradicted this earlier statement by saying it was locked occasionally. He later offered a third version by saying it was locked only twelve times when he attempted to steal grain. Recognizing this, LaBolt conceded in its statement of disputed facts that Pew’s testimony could not be accepted entirely as a statement of undisputed fact.

. Pew claimed, however, the locks were not always locked. See supra n. 1. Syltie also testified that Pew used a wrench to remove the locking mechanism from the chutes rather than tampering with the locks.

. Pew pleaded guilty in United States District Court for the District of South Dakota to one count of violating 18 U.S.C. § 1341, obtaining property by fraud or false pretense and using the United States Post Office for the purpose of effecting the scheme. He was serving his sentence at the Federal Prison Camp in Duluth, Minnesota, at the time of this appeal.

. This has consistently been the law in this jurisdiction since its inception. Dakota Revised Civil Code §§ 1970-1971 (1877).

. The Court reasoned:
Upon principle, it is not easy to give a satisfactory reason why the true owner, who has been guilty of no wrong or negligence, should be prejudiced by a transaction between the wrongful taker of his property and a third person, or how such a transaction can impose upon him a new obligation. Having been guilty of no act impairing, or in any manner qualifying, either his right of property or his right of immediate possession, he may assert such right whenever and wherever he finds his property.
Rosum, 47 N.W. at 142.

. The Dakota Revised Civil Code § 1970 (1877) provides:
The detriment caused by the wrongful conversion of personal property is presumed to be:
One — The value of the property at the time of the conversion, with the interest from that time; and,
Two — A fair compensation for the time and money properly expended in pursuit of the property.
Section 1971 (1877) provides:
The presumption declared by the last section cannot be repelled, in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent.

. If LaBolt was claiming that WestCon failed to mitigate damages that occurred after Pew was discovered stealing the grain on camera, the doctrine of mitigation of damages would apply. WestCon's duty to mitigate damages began to apply only after it knew how the grain was being stolen and by whom.