WIETING et ux., Respondents
v.
BALL AIR SPRAY, INC., Appellant

(173 N.W.2d 272)

(File No. 10603.  Opinion filed December 17, 1969)

**Benson, Beach & Fingerson,** Huron, for defendant and appellant.

**Blue & Haeder,** Huron, for plaintiffs and respondents.

HOMEYER, Judge.

This is a tort action in which plaintiffs, George Wieting and Anna Wieting, recovered a judgment for $1700 against the defendant, Ball Air Spray, Inc., upon a jury verdict. The Wietings are farmers and they claim their property, specifically trees and gardens, was damaged when an employee of defendant negligently sprayed by airplane an adjoining cornfield belonging to a neighbor, Morris Mortimer, with 2-4-D and such chemical either was discharged upon or drifted onto the Wieting property. The defendant has appealed.

This court has not heretofore had occasion to consider the question of liability to an adjoining landowner for spraying of

crops with economic poisons. Currently there is much discussion on dangers to health and property from the application of poisons to control weeds, rodents, insects, et cetera. This state by statute permits spraying and dusting from airplanes, SDCL 1967, 38-21-1 et seq., by a licensed applicator. As a prerequisite an applicant for a license must submit proof of financial responsibility and absence of unsettled claims or unsatisfied judgments from prior aerial or ground spraying among other things. The Secretary of Agriculture is authorized to adopt such rules and regulations as he deems necessary and proper for the administration of the law.

■ Courts generally have held that farmers have the right to use beneficial dusts and sprays to eliminate weeds which choke out or stunt growth. However, such use cannot be made with absolute impunity and due care must be exercised in seeing that weather conditions are right and that the poisonous spray or dust is not negligently spread. See Annot., 12 A.L.R.2d 436; 8 Am.Jur.2d, Aviation, § 101. At least one jurisdiction has applied the doctrine of strict liability for damage to a neighbor's crops resulting from use of a poisonous herbicide. Gotreaux v. Gary, 232 La. 373, 94 So.2d 293.

Appellant's chief contention is that there is no evidence to show that it was negligent and the trial court erred in refusing to grant its motions for a directed verdict.

The Wieting farmstead includes two dwelling houses and other farm buildings. Trees of different varieties were planted around the houses and in the farmyard at various times since 1946. A shelter belt was planted in 1949. A north-south county road separates the Wieting farmstead from the Mortimer cornfield. A telephone line is on the west side of the road and an electric power line about 25 foot high is on the east side. A plat drawn to scale, Exhibit 2, was received in evidence and shows the location of the buildings, trees, the width of the road, and other geographical factors. The distance between the Mortimer cornfield and the Wieting farmstead is shown as 72 feet at most points.

The evidence shows that Mortimer employed defendant to spray approximately 186 acres of which about 48 acres is in the cornfield adjacent to the Wieting farm site. Defendant's employees went to the Mortimer farm on the evening of June 30, 1965, but decided not to spray because the wind was too strong. They returned again early the next morning and sprayed several other tracts before beginning on the tract directly west of the Wieting farm. The airplane was equipped with a tank to hold the mixed chemical, circulating pumps, boom and valves to control application of the spray. The boom had 16 openings and when the proper valve was opened the spray would be discharged in liquid form under pressure through these openings.

The work crew consisted of a solo pilot and a flag girl on the ground. The flag girl directed the pilot to the right fields and guided him in discharging the spray. The pilot testified he started spraying the 48 acre field from the south side and proceeded from west to east taking swaths about 45 feet wide. The corn was from three to four feet tall and he would swoop to within one or two feet of the top, open the valve and then continue flying level with the ground to the end of the field at a speed of about 90 miles per hour. He would circle and then traverse the field in the opposite direction in the same manner. As he flew from west to east towards the Wieting farm, he said he shut off the valve about 150 feet from the east edge of the cornfield, and pulled the stick to raise the flying height to clear the transmission line, trees and buildings. Returning to cross the field he said he delayed opening the valve until about 150 feet from the east border. The flag girl in essence confirmed this procedure.

George Wieting testified he was awakened during the early morning hours by the sound of an airplane flying close to his house. He went outside and observed the spraying operation. The plane was flying over the farmstead and directly above him in the farmyard. He described the wind as from the west-north-west and said it increased in velocity during the spraying; he called it "a good stiff breeze". He smelled a very strong spraying odor and felt the liquid spray against his skin and face. His

wife telephoned Mortimer and asked that the spraying be discontinued. Mortimer arrived on the scene shortly afterwards, but at that time only one or two swaths remained and the pilot completed the job.

The Wietings soon noted extensive damage to the gardens and some damage to their trees, primarily to the Chinese elm. The tree damage got progressively worse during the balance of 1965 and in 1966 and 1967. At the time of trial there were 52 trees completely dead and 31 trees which were partially dead, mostly of the larger variety and in the top branches. Plaintiffs and their witnesses related the damage to poisonous spraying. Some of defendant's witnesses acknowledge seeing some 2-4-D damage to the gardens and to some of the trees shortly after the spraying. However, for the most part they either minimized such damage or ventured opinions that it was not and could not have been caused by spraying and resulted from other causes. One of such witnesses was an agronomist, the other a plant pathologist, both from one of our state universities. In general their testimony was indefinite and guarded on the precise cause of the tree damage.

We have repeatedly announced the rule that where the sufficiency of the evidence to sustain a verdict is questioned, we must resolve every conflict in the evidence and every inference which may reasonably be drawn from such evidence in favor of sustaining the verdict. If there is any substantial evidence from which reasonable men could find the ultimate facts to be such as will sustain the verdict, the judgment will be affirmed. Gustafson v. Gate City Co-op Creamery, 80 S.D. 430, 126 N.W.2d 121; Barnhart v. Ahlers, 79 S.D. 186, 110 N.W.2d 125.

We believe the jury could reasonably and logically find that the wind velocity was in excess of what was reasonably safe for aerial spraying and that the pilot was not exercising due care under existing weather conditions. An obvious inference from the defense testimony is that it is not prudent to spray when there is "a stiff breeze". Defendant's own witnesses admitted that normally when there are electric lines, telephone lines,

trees and buildings near the end of a field they spray parallel to them for several spray widths. It is undisputed that this was not done and no reason was given for not doing it. It can be inferred that parallel spraying at the end of the field may have eliminated or minimized the hazard incidental to split-second manipulation of the valves which control the discharge of the liquid spray.

We believe the jury could also find that the pilot did not shut off the spray as soon as he said he did and that he discharged some of it closer to the east edge of the field than 150 feet and in a manner so that it drifted upon plaintiff's property or fell upon it as he passed overhead. George Wieting testified he felt the liquid and a stinging sensation against his face.

■ No useful purpose would be served in further relating the detailed testimony submitted by the respective parties, much of which was disputed and on some of which there was little or no dispute. The jury had the right to take into consideration all the circumstances surrounding the matter concerning testimony which was given in determining the weight to be given thereto. If reasonable men could come to different conclusions when that testimony, be it expert or nonexpert, is considered in the light of what occurred, the final decision in accepting or rejecting such testimony is for the jury. 31 Am.Jur.2d, Expert and Opinion Evidence, § 183. We hold the evidence both as to negligence and causation of damage is ample to support the verdict.

Plaintiff's proof of damages consisted of evaluating the cost of replacing the smaller trees which he claims died from the poison spray and the cost of pruning, removing and hauling away the dead branches on the larger trees. He also introduced evidence as to loss of shade and beauty during the time the replaced and damaged trees would be growing to their previous condition. The garden damage was approximated.

■ The court instructed generally on the rule of damages in tort actions, SDCL 1967, 21-3-1, and the duty to minimize, and that the damages allowed must be reasonable and

not based on conjecture. Appellant contends the damage was to plaintiffs' real estate and the court should have instructed that the measure of damage was the diminished value of the real estate. We see no error in the instructions under the evidence in this case.

In a recent case, Ward v. LaCreek Electric Association, 83 S.D. 584, 163 N.W.2d 344, we had occasion to consider the proper measure of damages where there was no permanent injury to real estate. We said "There is no one measure of damages so flexible it will fairly compensate for all injury to real property". In that case where there was evidence that the house could be repaired we confined the damage to the difference between the before and after value of the house as distinct from the ranch unit of which it was a part, or the reasonable expense of repair if it could be substantially restored to its former condition, whichever was the lesser. See also Kressly v. Theberge, 79 S.D. 386, 112 N.W.2d 232.

Since plaintiffs elected to treat the damage suffered as of a temporary nature the trial court did not err either in admitting evidence on damages or in instructions pertaining thereto.

One of plaintiffs' principal witnesses was the owner and operator of a nursery and landscaping business who had been so engaged for nearly 16 years. He held a state license, attended short courses pertaining to his work, and testified to extensive experience in observing tree and plant damage caused by use of economic poisons including 2-4-D. This witness made three inspections of the Wieting property, the first being June 14, 1966. Appellant urges the trial court erred in receipt of his opinion that the tree damage was caused by 2-4-D.

Although there is evidence other than by this witness to show that the tree damage was caused by defendant's use of 2-4-D spray upon the Mortimer cornfield, it is our opinion that the trial court did not err in the receipt of this testimony.

The qualifications and competency of an expert witness to render an opinion is primarily in the discretion of the trial court

and his ruling in determining qualifications will not be disturbed unless there is no evidence that the witness possessed the qualifications of an expert or the trial court proceeded under erroneous legal standards. State ex rel. Helgerson v. Riiff, 73 S.D. 467, 44 N.W.2d 126, 31 Am.Jur.2d, Expert and Opinion Evidence, § 31. The latter is not the instant situation.

Affirmed.

All the Judges concur.