John COLTON and Pamela Colton,
Plaintiffs and Appellees,

v.

Lee DECKER and Betty Decker,
Defendants and Appellants.

Nos. 18709, 18710.

Supreme Court of South Dakota.

Argued March 21, 1995.

Decided Nov. 15, 1995.

Rehearing Denied Dec. 13, 1995.

Thomas J. Johnson, Sioux Falls, for plaintiffs and appellees.

Gail E. Fisher, Sioux Falls, for defendants and appellants.

KONENKAMP, Justice.

After his truck was seized by law enforcement officials for having multiple serial numbers the owner sued and recovered damages from the seller. Both parties appeal. We affirm the breach of warranty of title but reverse and remand a portion of the damages award.

## FACTS

Lee Decker, an over-the-road trucker, purchased a repossessed 1975 Peterbilt truck, Model 359, from a Minnesota bank in 1984. The truck's history is not completely known, but its rails or frame had apparently been extended from its original length to accommodate a double sleeper and it had also been wrecked at one time. The vehicle identification number (VIN) listed on the Minnesota title was 60596P. Decker transferred the truck's title to South Dakota. Although he claims not to have made any major structural changes, on several occasions Decker has acknowledged he rebuilt the truck "from the frame up."

Over a nine-month period in 1989, John Colton, who worked as a driver for Decker,[1] drove the 1975 Peterbilt nearly 100,000 miles. In late December of that year, he offered to purchase the truck for $22,000. To help obtain financing Decker provided Colton with a list of the truck's features. On the list he wrote, "I spent 3 months rebuilding from the frame up when I first got the truck. 90% of the work was performed by myself." Decker's signature immediately followed. Assured of the truck's good condition, Marquette Bank of Sioux Falls financed Colton's purchase. On March 8, 1990, Decker's South Dakota truck title was transferred to Colton.

On August 22, 1991, Colton was stopped by the Wyoming Highway Patrol near Rock Springs, Wyoming and cited for speeding. After noting discrepancies in his logbook, the trooper inspected the rig and discovered that the VIN stamped on the right frame rail did not match the VIN listed on the registration. Conflicting VINs commonly indicate a stolen vehicle or stolen parts. The truck, but not the loaded trailer, was then impounded. Colton hired another trucker to haul the cargo in his trailer to Salt Lake City and retained a Wyoming attorney, but the attorney could not obtain immediate release of his truck. Colton returned to South Dakota. During the months waiting to recover his vehicle, he found some work driving trucks for other companies.

Meanwhile, Wyoming authorities disassembled Colton's truck in search of other serial numbers. The letter "K" in one conflicting number indicated that a glider kit[2] had been used. A third VIN, stamped with a manufacturer's die, was also discovered. Although more numbers matching the VIN on the title were found at various points on the truck (some hidden beneath paint and body putty), the numbers had not been imprinted by the

---

1. Lee Decker and John Colton are the principals here. Their respective wives, Betty and Pamela, as partners and co-owners in their respective businesses, are also named parties.

2. Glider kits are parts used to update and replace older equipment on the truck such as frame rails, hood, drive line, and sleeper.

manufacturer, but had been stamped by hand, apparently with a hardware store die. For example, a VIN matching the title was hand-stamped on a crudely fashioned rectangular piece of tin and affixed to the fire wall just above the clutch pedal.

Upon completing their nine-month investigation, Wyoming authorities determined Colton was indeed the true owner. A Wyoming court ordered a new Wyoming title to be issued clarifying the conflicting serial numbers. The truck would then be released upon payment of a $1,000 storage fee. Colton, who was now behind on loan payments, borrowed the money from Marquette Bank, traveled to Wyoming, and paid it. Unfortunately, the truck was inoperable, because while in Wyoming's possession, it remained dismantled and unsheltered throughout the winter. On April 11, 1992, Colton towed the truck from Wyoming back to Sioux Falls.

Once home, Colton placed the truck in storage until he could raise the money to repair it. Despite the court order, Colton was unable to obtain a new title in Wyoming because Marquette Bank refused to surrender the South Dakota title—its collateral—to Wyoming authorities. The bank also refused to exchange the faulty title for a new South Dakota "rebuilder's" title. Colton filed suit against Decker alleging breaches of warranty of title, warranty of merchantability, and express warranty of description. He also sent Decker a notice of intent to rescind the sale of the truck.

At trial on November 4–5, 1993, Decker disputed that his reconstruction of the truck required a rebuilder's title. SDCL 32–3–1(17), 32–3–53. After noting in its memorandum opinion (incorporated into the findings of fact and conclusions of law) that the man who assisted Decker in rebuilding the truck had noticed differing serial numbers, the trial court wrote:

> [Decker] bought it as a wrecked truck, tor[e] it down and rebuilt it. Even though he did not replace the parts which bore the different VINs, the discrepancies were obvious and discovered at the time he was rebuilding the vehicle.

The court awarded Colton $27,572.71 for breach of warranty of title. His other al-leged breaches and offer to rescind were rejected. Both parties appeal raising the following issues:

I. Did the trial court err in holding that Decker breached warranty of title?

II. Did the trial court err in its assessment of damages for breach of title warranty?

III. Did Decker breach warranty of merchantability?

IV. Did Decker breach express warranty of description?

We affirm the court's ruling on breach of warranty of title, but reverse and remand for reassessment of certain damages.

## DECISION

### I. Warranty of Title

■ Wyoming authorities challenged the authenticity of Colton's title as the truck had three different VINs engraved at various points. Under these circumstances Colton averred Decker breached the warranty of title under SDCL 57A–2–312:

(1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that

(a) The title conveyed shall be good, and its transfer rightful; and

(b) The goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

(2) A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

Comment 1 to UCC § 2–312 states a buyer is entitled to "receive a good, clear title transferred ... in a rightful manner so [the buyer] will not be exposed to a lawsuit in order to protect it." A split of authority persists on the scope of § 2–312. Decker relies on those cases which hold that a breach of war-

ranty of title occurs only when an outstanding superior title exists.[3] *See, e.g., C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543 (Iowa 1983); *Johnston v. Simpson*, 621 P.2d 688 (Utah 1980). Other courts hold that under § 2–312 mere initiation of a colorable challenge, one which is not spurious, regardless of the outcome, is sufficient to violate the warranty of title. *Jefferson v. Jones*, 286 Md. 544, 408 A.2d 1036, 1042 (1979) (law enforcement seizure of motorcycle when its VIN did not correspond to VIN in title document was colorable claim thus seller breached title warranty); *American Container Corp. v. Hanley Trucking Corp.*, 111 N.J.Super. 322, 268 A.2d 313 (1970) (law enforcement seizure of semi-trailer as stolen sufficient to cast substantial shadow thus violating warranty of good title). "Good title" typically means "the title which the seller gives to the buyer is 'free from reasonable doubt, that is, not only a valid title in fact, but [also] one that can again be sold to a reasonable purchaser …'" *Jefferson*, 408 A.2d at 1040 (quoting *Langford v. Berry*, 68 Ga.App. 193, 22 S.E.2d 349, 351 (1942)). We find the latter to be the better rule.

Wyoming Highway Patrol officials questioned Colton's ownership due to contradictory VINs thus casting a colorable challenge to its title. This was sufficient for a breach of title warranty claim. *American Container Corp.*, 268 A.2d at 318; *City Car Sales, Inc. v. McAlpin*, 380 So.2d 865 (Ala. Civ.App.1979); *Ricklefs v. Clemens*, 216 Kan. 128, 531 P.2d 94 (1975). Indeed, the majority view holds that a purchaser can recover for a breach of warranty of title by merely showing the existence of a cloud on the title. *Maroone Chevrolet, Inc. v. Nordstrom*, 587 So.2d 514, 518 (Fla.Dist.Ct.App.1991). Once breach of good title is established, good faith is not a defense, nor is a lack of knowledge of the defect. James A. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 9–12 (3d ed. rev. 1993); *Smith v. Taylor*, 44 N.C.App. 363, 261 S.E.2d 19 (1979). Purchasers should not be required to enter into a contest on the validity of ownership over a

titled motor vehicle. *Frank Arnold Contractors v. Vilsmeier Auction Co., Inc.*, 806 F.2d 462, 464 (3rd Cir.1986); *Maroone Chevrolet*, 587 So.2d at 518; *American Container*, 268 A.2d at 318; *Ricklefs*, 531 P.2d at 100. As the undisputed facts reveal, Colton was forced into a contest over ownership because of conflicting VINs and an improper title. Thus, we uphold the circuit court's ruling that Decker breached the warranty of title. *Maroone Chevrolet*, 587 So.2d at 518.

## II. Damages

Colton was awarded total damages of $27,572.71, consisting of $14,000 for the value of the truck and $13,572.71 for costs incurred retrieving it from Wyoming and storage. Breach of warranty damages are calculated under SDCL 57A–2–714:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under § 57A–2–715 may also be recovered.

### Truck's Diminution in Value

Ample special circumstances take this case out of the "time of acceptance" provision in SDCL 57A–2–714. Here the measure of damages begins with determining the value of the truck at the time of dispossession. *Ricklefs*, 531 P.2d at 101; *John St. Auto Wrecking v. Motors Insurance*, 56 Misc.2d 232, 288 N.Y.S.2d 281 (1968). Testimony established the truck was worth $22,000 when impounded, meaning it apparently did not depreciate in value during the months between Colton's purchase and the impoundment. Dismantled and unprotected from the Wyoming winter, uncontroverted testimony valued the truck at $8,000 in salvage. The trial court properly considered the "special circumstances" of SDCL 57A–2–714(2) to in-

---

**3.** Indeed, the UCC drafters flatly stated "The warranty of quiet possession is abolished." Comment 1 UCC § 2–312. Yet the same comment states, "Disturbance of quiet possession, although not mentioned specifically, is one way, among many, in which the breach of the warranty of title may be established."

clude the devaluation of the vehicle while in the hands of the Wyoming Highway Patrol and awarded the difference to Colton. Was the truck worth less than $22,000 at the time of impoundment? Could the truck have been worth more than $8,000 at the time it was released? The trial court could not answer those questions, as neither party offered any other estimates. The $14,000 award on the loss of the truck due to the breach is affirmed. *Carlson v. Rysavy*, 262 N.W.2d 27 (S.D.1978).

*Retrieving the Truck*

■ Of the $13,572.71 awarded for impoundment, retrieval, and storage expenses, Decker does not dispute that $4,810.10 of this amount relates to expenses incurred in connection with the seizure of the truck by Wyoming authorities.[4] Decker argues the remaining expenses cannot be upheld as incidental damages pursuant to SDCL 57A-2-715(1):

> Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

Towing back to Sioux Falls was properly allowed as a reasonably foreseeable expense, not only because the truck was inoperable, but also because driving the still defectively-titled vehicle imposed the risk of another seizure along the route home. *White & Summers* at § 10–4; *Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists*, 14 Cal.App.3d 209, 92 Cal.Rptr. 111 (1971). An award based upon a bona fide effort to compensate for consequences of defects that establish a breach of warranty is a remedy the UCC seeks to provide. *McGrady v. Chrysler Motors Corp.*, 46 Ill.App.3d 136, 4 Ill.Dec. 705, 360 N.E.2d 818 (1977). Expenses incurred retrieving the truck from Wyoming

were reasonable expenses incident to the breach.

*Storing the Truck*

■ Colton spent $2,375 to store the truck near Sioux Falls, a truck worth $8,000 in salvage. Here, the causal link between the breach and the damages became so attenuated the damages were no longer incident to the breach. SDCL 57A-2-715(1); *White & Summers* at § 10–3. This was unreasonable, unexpected and served only to drive up expenses and devalue the truck. Neither does this expense meet the requirements for consequential damages under SDCL 57A-2-715(2):

> (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

> (b) Injury to person or property proximately resulting from any breach of warranty.

The law should not encourage waste. Even though the breach started the chain of events, Colton could not leave the truck in storage for an indefinite time until he had the finances to repair the damage caused in Wyoming. Consequential damages must be reasonably foreseeable by the breaching party at the time of contracting. John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS § 6–5, at 308 (3d ed. 1987); *Petroleo Brasileiro, S.A. Petrobras v. Ameropan Oil Corp.*, 372 F.Supp. 503, 508 (E.D.N.Y.1974); 5 A. Corbin, CORBIN ON CONTRACTS § 1010, at 79 (1964). The storage fees fail to qualify as reasonably foreseeable. Once Colton retrieved his truck, his responsibility included mitigating further loss. *Brown v. City of Yankton*, 434 N.W.2d 376 (S.D.1989). The official comment to UCC § 2–715(2) states recovery is impermissible "unless the buyer could not reasonably have prevented the loss by cover or otherwise."

---

4. This amount is composed of towing fees [in Wyoming], hiring another trucker to haul his load to Salt Lake City, retrieving his trailer from Salt Lake City, retaining a Wyoming attorney to get the truck out of impoundment, postage, a loan from Marquette Bank to pay the storage fee, and the motel and long distance expenses while authorities kept Colton in Wyoming.

*Attorney Fees*

■ Colton incurred legal fees in South Dakota attempting to clear the title and retrieve the truck from Wyoming. The trial court allowed these fees as damages under SDCL 57A–2–715. As an element of damages, the attorney's fees were reasonable expenses incident to the impoundment for clouded title. *Kelynack v. Yamaha Motor Corp.,* 152 Mich.App. 105, 394 N.W.2d 17 (1986); *Cady v. Dick Loehr's, Inc.,* 100 Mich. App. 543, 299 N.W.2d 69 (1980).

■ In his notice of review Colton argues the trial court erred in not allowing his attorney's fees for prosecuting this suit. Also, Colton contends the trial court should have awarded him the attorney fees his bank incurred. Trying to get the title issue resolved, Marquette Bank paid attorney fees, which it added to Colton's loan balance. Other than referring to the UCC, Colton cites no authority to support these arguments. We conclude the trial court properly declined to award such fees as damages under SDCL 57A–2–715(1) or (2) or as disbursements under SDCL 15–17–38.

*Rescission and Revocation*

■ The trial court denied Colton's request for rescission stating that due to "the length of time and the changed condition of the truck, it would be very difficult to return the parties to the condition they were in before the sale." Colton concedes that if "rescission" was an inappropriate remedy under the UCC, then the trial court should have permitted him to revoke acceptance under SDCL 57A–2–605. Revocation is a permissible substitute for rescission under the UCC in some jurisdictions. *Henderson v. Chrysler Corp.,* 191 Mich.App. 337, 477 N.W.2d 505, *appeal denied,* 439 Mich. 1010, 485 N.W.2d 501 (1992); *City National Bank of Charleston v. Wells,* 181 W.Va. 763, 384 S.E.2d 374 (1989). But Colton's failure to raise this issue at the trial level bars him from raising it on appeal. *Weaver v. Boortz,* 301 N.W.2d 673 (S.D.1981).

*Prejudgment Interest*

■ The trial court denied Colton's request for prejudgment interest. SDCL 21–1–11 provides:

Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

A party is not entitled to prejudgment interest where the amount of damages remains uncertain until determined by the trial court. *Amert v. Ziebarth Construction Co.,* 400 N.W.2d 888 (S.D.1987). If a person cannot know what sum is owed until a court determines it, that person cannot be held accountable for not paying it. On the other hand, merely because a claim is disputed does not defeat the allowance of interest. *Barton Masonry, Inc. v. Varilek,* 375 N.W.2d 200 (S.D.1985). Decker could not have anticipated whether the trial court would have allowed rescission or accepted one of Colton's breach of warranty theories. Neither could Decker have known what consequential or incidental damages would be awarded in this unusual case. Nonetheless, though not all damages were reasonably ascertainable, we conclude the trial court improperly denied prejudgment interest on a portion of the damages. The $4,810.10 expended during Colton's initial stay in Wyoming was readily ascertainable as were the costs of transporting the truck back to Sioux Falls. Colton is entitled to prejudgment interest on those amounts only. *Arcon Constr. Co. v. South Dakota Cement Plant,* 405 N.W.2d 45 (S.D. 1987).

*Unawarded Damages*

■ Colton further seeks compensation for repairs to the truck, lost profits, lost investment opportunities, and use of an expert witness. The trial court declined to award these damages or costs. We see no abuse of discretion for omitting these items from incidental and consequential damage consideration. *Stormo v. Strong,* 469 N.W.2d 816, 820 (S.D.1991).

### III. & IV. Warranty of Merchantability and Warranty of Description

■ The trial court found Colton had not proved breach of warranty of merchanta-

bility. Decker was involved in a one-man trucking business which he started in 1980. From time to time he bought and fixed a total of five trucks. The 1975 Peterbilt at issue here he bought and drove for five years before selling it to Colton. The court found Decker was not a merchant. SDCL 57A–2–314(1). Merchant status is a question of fact and Colton has failed to show how the trial court's ruling was clearly erroneous. *Cf. Terminal Grain Corp. v. Freeman,* 270 N.W.2d 806 (S.D.1978).

█ Colton argues the trial court erred in not finding that Decker breached an express warranty of description. SDCL 57A–2–313(1)(a)(b). He states:

> As a consequence of this misdescription ... [he] received a truck perched on set of rails that literally shook the truck apart. Coltons paid $10,133 in extra repair bills because of those rails. These were in excess of what they would have incurred without the chopped, pasted, puttied, ground and mismatched rails that formed the truck's foundation.

Colton knew he bought a restored truck. He knew the truck's characteristics before purchasing it; he drove it for nine months and almost 100,000 miles while working for Decker. After purchasing it, he drove it for many months. He never made any claim the truck was defective until after he recovered it from Wyoming. No evidence established that this truck was anything other than a 1975 Peterbilt Model 359 Tractor. The trial court correctly ruled that the title was defective, but Decker did not breach a warranty of description.

Affirmed in part, reversed in part and remanded.

MILLER, C.J., concurs.

SABERS, J., concurs in part and concurs in result in part.

AMUNDSON, J., concurs in part and dissents in part.

GILBERTSON, J., not having been a member of the Court at the time this case was considered, did not participate.

SABERS, Justice (concurring in part and concurring in result in part).

I concur on Issues I, III and IV. I concur in result on Issue II, Damages, because it appears that Decker may be paying for Colton's failure to mitigate his own damages. However, Decker has failed to establish that the trial court abused its discretion in awarding damages, except as stated and modified in the majority opinion.

AMUNDSON, Justice (concurring in part and dissenting in part).

I disagree with the majority's calculation of damages. The truck was impounded on August 22, 1991, and Colton towed the truck from Wyoming on April 11, 1992, however, the majority glosses over the fact that the Wyoming authorities offered release of the truck in January 1992 if Colton would pay $1,000 storage fee and forfeit the South Dakota title so that a new Wyoming title could be issued. It is undisputed that the value of the truck when impounded was $22,000. Colton could not afford the $1,000 fee so he went to his creditor, Marquette Bank. Marquette Bank refused to extend Colton's credit to pay the $1,000 and also refused to surrender the South Dakota title. So, from January until April, the dismantled truck endured the Wyoming winter. Decker should not be responsible for the diminution in value of the truck between January and April.

Colton's proper remedy is recovering this loss from Marquette Bank. Forcing Decker to pay for the unreasonable delay caused by Marquette Bank's actions is unjust. Colton had a duty to mitigate his damages, and any damages resulting from his failure to take reasonable steps to mitigate or prevent damages cannot be recovered from Decker. *See Wieting v. Ball Air Spray, Inc.,* 84 S.D. 493, 173 N.W.2d 272 (1969). SDCL 57A–2–715(2) states in part: "(2) Consequential damages resulting from the seller's breach include: (a) Any loss ... which could not reasonably be prevented by cover or *otherwise*[.]" (Emphasis added.) This loss could have been prevented by Marquette Bank's releasing the title in a timely manner. Surrendering the title in order for a new, clearer and correct title to be issued was the logical step for

Marquette Bank to take. Unfortunately, logic does not always play a part in today's world.

The buyer's right to recover for damages is not unlimited. Buyer must take reasonable steps to reduce or minimize his damages. 5 Ronald A. Anderson, Uniform Commercial Code § 2–715:27 (1983); *see also AES Technology Systems, Inc. v. Coherent Radiation,* 583 F.2d 933 (7th Cir.1978); *Lewis v. Mobil Oil Corporation,* 438 F.2d 500 (8th Cir.1971); *Baden v. Curtiss Breeding Service,* 380 F.Supp. 243 (D.Mont.1974); *Larrance Tank Corporation v. Burrough,* 476 P.2d 346 (Okl.1970); *LTV Aerospace Corporation v. Bateman,* 492 S.W.2d 703 (Tex.Civ.App.1973). However, buyer will be excused from mitigation when his financial condition will not allow him to take mitigating steps. *Nyquist v. Randall,* 819 F.2d 1014 (11th Cir.1987); *Lake Village Implement Company v. Cox,* 252 Ark. 224, 478 S.W.2d 36 (1972); *Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adv.,* 14 Cal. App.3d 209, 92 Cal. Rptr. 111 (1971).

In this case, however, it was not buyer who refused to take mitigating steps, but buyer's creditor, Marquette Bank, who refused to take the necessary steps. The general rule is that a bank is required to maintain a "duty of good faith and fair dealing toward its customers." *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 846 n. 9 (S.D.1990). Whether or not Marquette Bank acted in good faith is not at issue here, however, Decker should not be punished for the action or inaction of Marquette Bank. Therefore, we should remand in order for the trial court to assess the correct amount of damages.