#25700, #25701-aff in pt & rem in pt-GAS

**2011 S.D. 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TERRY BROWN and SUSAN BROWN,  Plaintiffs and Appellees,

v.

JAMES HANSON,  Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JEROME A. ECKRICH, III
Judge

\* \* \* \*

DYLAN A. WILDE
THOMAS E. BRADY of
Brady & Pluimer, P.C.
Spearfish, South Dakota  Attorneys for plaintiffs
and appellees.


BRAD P. GORDON
ROGER A. TELLINGHUISEN of
Tellinghuisen & Gordon, P.C.
Spearfish, South Dakota  Attorneys for defendant
and appellant.

\* \* \* \*

ARGUED FEBRUARY 16, 2011

OPINION FILED **05/18/11**

SEVERSON, Justice.

[¶1.]     Terry and Susan Brown purchased land adjacent to James Hanson. The neighbors signed a Common Well and Road Easement Agreement. The document was filed in the office of the Meade County Register of Deeds. Believing the Browns had breached the terms of the agreement, Hanson filed a letter "rescinding" the agreement with the register of deeds. The Browns filed a lawsuit. The trial court granted the Browns' motion for partial summary judgment requesting declaratory judgment. On appeal, this Court affirmed the trial court's ruling that rescission was not the appropriate remedy for breach of the easement. On remand, a court trial was held on the remaining issues. Hanson now appeals judgment in favor of the Browns on claims of slander of title and tortious interference with a business contract. Hanson also appeals the award of attorneys' fees and other damages. We affirm in part and remand in part.

**FACTS**

[¶2.]     Additional facts of this case are set forth in *Brown v. Hanson* (*Brown I*), 2007 S.D. 134, ¶¶ 1-4, 743 N.W.2d 677, 678-79. In 1995, James Hanson and his wife purchased property in Sturgis, South Dakota. Hanson's sister and brother-in-law, Debbie and Virgil Schulz, purchased the adjacent property around the same time. Hanson constructed a well on his property that supplied water to his land as well as the Schulzes' land. A road on Schulzes' land provided access to Hanson's land. The Schulzes allowed a small group of out-of-state family and friends to camp on their land each year during the Sturgis Motorcycle Rally. Virgil built a shower

house for the campers in 1999. The campers were charged $8 per day to camp. The Hansons were aware of the arrangement.

[¶3.]    The Browns purchased the Schulzes' property in June 2000. The Browns and Hansons entered into a Common Well and Road Easement Agreement (Agreement), which provided in part:

> That this Agreement shall be binding upon Brown, Hanson and their respective heirs, successors, and assigns, and shall be considered to be a covenant running with the land. . . . The parties agree that the well located upon the Hanson [p]roperty shall be utilized to provide water service to both the Hanson [p]roperty and the Brown [p]roperty. The parties each agree to use the water from the well for domestic purposes only and neither party shall sell any water from the well, without written consent of the other party.

The Agreement further provided that the Browns and Hansons would each be responsible for one-half of the cost for electricity to the well, maintenance to the well, and the maintenance of the water main. Each party agreed to use the water for "domestic purposes only." The Agreement also granted Hansons an easement over the Browns' property, and split the cost of maintenance for the access road.

[¶4.]    The Browns continued to host the campers each year for a small fee. Throughout the five years the Browns lived there, Hanson was aware of the campers and their use of the shower house. At no time did Hanson complain or object to the Browns' use of the shower house.

[¶5.]    In 2005, Hanson's business partner, Andra Olson, asked the Browns if they would be interested in selling. The Browns explained that they were not interested at that time. About one year later, the Browns wanted to move and called Andra to see if she still wanted to purchase their land. Andra requested

more time to consider it but never responded. Hanson told his daughter that the Browns' property was for sale, and she offered to purchase the property for $210,000. Because the offer was $78,000 below their asking price, the Browns rejected the offer. After the rejection, the daughter called the Browns and told Ms. Brown, "You know, that agreement is between you and my dad only."

[¶6.]     The Browns received a letter dated May 19, 2006, from Hanson. In it, he stated, "You have breached both paragraphs 2 and 4 [of the Agreement] . . . by **not** using the well for domestic purposes and by **failing to pay** half of the cost of the electricity for the well." In addition, Hanson wrote that it was a further breach of the Agreement that the Browns were "advertising your property for sale and improperly using the camp ground income as buyer inducement to purchase the property" because "you are attempting to sell a commercial use of the water that you simply do not have." Because of these breaches, Hanson stated that, "effective upon receipt of this letter I have terminated [Agreement] dated June 14, 2000." Hanson concluded by informing the Browns that, "If you desire to have me further supply your residence with water under a new agreement for only domestic purposes then you will need to contact me."

[¶7.]     After receiving the May 19, 2006 letter from Hanson, the Browns met with an attorney, who told them that Hanson could not legally rescind the Agreement. After the meeting, the Browns showed their property to Joe and Paula Ford. During the viewing, Mr. Brown informed the Fords of the issues Hanson raised regarding the Agreement and that he was claiming it was rescinded. The Fords received a copy of the Agreement and took it to their own attorney. After

discussing the issues raised by Hanson, the attorney told the Fords he believed the Agreement was still in effect and would run with the property. The Fords and Browns met again and entered a Purchase Agreement dated June 11, 2006. The Fords were to purchase the Browns' property for $280,000 on July 11, 2006.

[¶8.] After entering the Purchase Agreement, the Browns directed their attorney to respond to Hanson's letter. The attorney told Hanson in a letter dated June 16, 2006, that he was not allowed to rescind the Agreement and that the Browns would pay their share of the electricity costs for the well if he would provide copies of the bills, subtracting what they had already paid to the electric company. Despite the attorney's letter, Hanson filed his May 19, 2006 letter with the Meade County Register of Deeds on July 5, 2006. The next day, Hanson sent the attorney a letter. Hanson clarified, "Let there be no mistake about my thoughts, I am not looking for money owed for water illegally taken. Rather, I am repudiating the well agreement due to your clients' material breaches of it." Hanson further stated, "I repeat again that there is no longer a well agreement. Any past agreement no longer exists!!!" The letter also indicated that the Browns were to contact his attorney if they wanted a new well agreement and that Hanson would turn off the water to the Browns in 90 days.

[¶9.] The Browns and the Fords went to the Meade Title Company on July 11, 2006, to close on the property. There they learned that Hanson filed his May 19, 2006 letter with the register of deeds. The ability to close on the sale and purchase was prohibited because the filed letter caused an exception to be placed on the title

policy.  Mrs. Ford contacted their mortgage company and was informed that they would not receive financing with the exception on the title policy.

[¶10.]     Mrs. Ford then contacted Hanson.  She offered to enter a well agreement with him so they could close on the property sale with the Browns.  Mrs. Ford testified that Hanson was angry and he told her the Fords did not have a right to the Browns' property because "[his daughter] had put an offer in, it was a good offer, [and the] Browns should have taken it."  After Hanson's refusal to work anything out with the Fords, the Fords went to the Browns and entered a Residential Lease Agreement.  Despite repeated attempts by the Browns' attorney, Hanson was unwilling to rescind his filing.  Furthermore, although Hanson claimed he would enter a new agreement, he insisted upon several conditions including: (1) the Browns' acknowledgement that the Agreement was terminated; (2) the Browns' agreement to "indemnify Mr. Hanson in any form or fashion relating to any future legal actions or lawsuits occurring between the Browns and their buyers of the property"; and (3) the Browns' reimbursement of attorneys' fees to Hanson.

[¶11.]     The parties were unable to reach a new agreement.  The Browns filed a complaint requesting a declaratory judgment that Hanson was not entitled to rescind the Agreement.  They further alleged that Hanson had breached their Agreement by claiming to rescind it, that Hanson had slandered their title by filing his letter with the register of deeds, and that Hanson committed tortious interference with their contract to sell the property to the Fords.  The Browns requested compensatory and punitive damages with interest and attorneys' fees.  After proper motions, the trial court granted summary judgment in favor of the

Browns on the declaratory judgment action, finding that Hanson could not legally rescind the Agreement. This Court unanimously affirmed the circuit court. *Brown I*, 2007 S.D. 134, 743 N.W.2d 677.

[¶12.] Meanwhile, Hanson and the Fords entered a new Common Well Agreement on June 25, 2007. With the new agreement in place, the Fords' mortgage company agreed to provide the financing necessary to close on the property. The closing between the Browns and the Fords occurred on June 29, 2007.

[¶13.] A trial to the court was held July 16 and 17, 2008. The trial court's findings of fact and conclusions of law were not filed until June 8, 2010. On June 19, 2010, the trial court granted judgment in favor of the Browns on slander of title and tortious interference with a business contract. It also granted punitive damages and attorneys' fees. Total damages were awarded as follows:

| | |
|---|---|
| Pecuniary damages: | $3,965 plus prejudgment interest at 10% |
| Attorneys' fees: | $21,618.70 plus post-judgment interest at 10% |
| Punitive damages: | $14,000 plus post-judgment interest at 10% |

[¶14.] On appeal, Hanson raises the following issues:

1. Whether the trial court erred in finding Hanson liable for slander of title.

2. Whether the trial court erred in finding Hanson liable for tortious interference with a business contract.

3. Whether the trial court erred in awarding the Browns' attorneys fees for Hanson's slander of title.

4. Whether the Browns are entitled to claim as compensatory damages the $6,300 credit they gave to the Fords.

[¶15.]    On appeal, the Browns raise the following issue:

>    5.    Whether the trial court erred in the amount awarded for pecuniary damages.

## STANDARD OF REVIEW

[¶16.]    The trial court's findings of fact are reviewed under the clearly erroneous standard of review. *McGregor v. Crumley*, 2009 S.D. 95, ¶ 15, 775 N.W.2d 91, 95. The trial court's conclusions of law are reviewed de novo. *Id.*

## ANALYSIS

[¶17.]    **1.    Whether the trial court erred in finding Hanson liable for slander of title.**

[¶18.]    The trial court found that Hanson slandered the Browns' title by filing the May 19, 2006 letter containing false statements with the county register of deeds. This Court has previously recognized a slander of title cause of action for filing a false mechanic's lien. *Gregory's, Inc. v. Haan*, 1996 S.D. 35, ¶ 12, 545 N.W.2d 488, 492. In *Gregory's*, this Court cited to the Restatement (Second) of Torts §§ 623A and 624 (1977), while discussing disparagement of property or slander of title. *Id.* at 493. The Restatement provides:

> § 623A. Liability for Publication of Injurious Falsehood-General Principle.
> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>    (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>    (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.
>
> § 624. Disparagement of Property-Slander of Title.

The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property.

§ 629. Disparagement Defined
A statement is disparaging if it is understood to cast doubt upon the quality of another's land, chattels or intangible things, or upon the existence or extent of his property in them, and
    (a) the publisher intends the statement to cast the doubt, or
    (b) the recipient's understanding of it as casting the doubt was reasonable.

There is no reason why this action should not apply to the letter Hanson filed with the register of deeds in this case.

[¶19.]       In order to prove slander of title, the plaintiffs must show that the publication was false and that the publication:

(1) was derogatory to the title to plaintiff's property, its quality, or plaintiff's business in general, calculated to prevent others from dealing with plaintiff or to interfere with plaintiff's relations with others to plaintiff's disadvantage (often stated as malice); (2) was communicated to a third party; (3) materially or substantially induced others not to deal with plaintiff; and (4) resulted in special damage.

*Gregory's*, 1996 S.D. 35, ¶ 12, 545 N.W.2d at 493. The threshold question is whether Hanson's letter contained false statements. In *Brown I*, this Court stated:

The parties agree that they had an express easement. An easement is "'an interest in the land in the possession of another which entitles the owner of such interest to a limited use or enjoyment of the land in which the interest exists.'" *Knight v. Madison*, 2001 S.D. 120, ¶4, 634 N.W.2d 540, 541 (citing *Gilbert v. KTI, Inc.*, 765 S.W.2d 289, 293 (Mo. Ct. App. 1988) (citations omitted)). South Dakota law recognizes a "right of taking water" as an easement "that may be attached to other land as incidents or appurtenances." SDCL 43-13-2. Additionally, "[t]he extent of

> a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." SDCL 43-13-5.

2007 S.D. 134, ¶ 6, 743 N.W.2d at 679.

[¶20.]     By its terms the easement is a covenant running with the land and nothing in the easement granted Hanson the authority to unilaterally rescind the easement. The trial court found that the issues Hanson pointed to in his letter as grounds for "rescinding" the Agreement were "illusory, false, and pre-textual." Evidence in the record supports this finding. Based on the express language of the Agreement and Hanson's claimed justifications for "rescinding" it, we conclude that his statements purporting to do so in the letter filed with the Meade County Register of Deeds disparaged Browns' property interest. *See Brown I*, 2007 S.D. 134, 743 N.W.2d 677. Hanson does not argue that other elements of the slander of title claim were not proven. Thus, we do not analyze the remaining elements of a slander of title claim.

### Conditional Privilege

[¶21.]     Hanson argues he has the defense of conditional privilege to the Browns' slander of title claim. Citing Restatement (Second) of Torts § 647, Hanson explains this privilege as the ability "to disparage another's property in land . . . by an assertion of an inconsistent legally protected interest in himself."

[¶22.]     This Court has previously discussed a conditional privilege to file good faith claims in public records. *Gregory's*, 1996 S.D. 35, ¶ 14, 545 N.W.2d at 494.

> The privilege is subsumed in the requirement that the person suing for disparagement of title must show malice or that the lien filer had an illegitimate purpose. Under this privilege, even if a lien filing was erroneous, it will not support a

> disparagement of title action if the person who filed acted in the reasonable belief that the filing was valid.

*Id.* (citing *Hicks v. Earley*, 357 S.W.2d 647 (Ark. 1962); *Sullivan v. Thomas Org.*, 276 N.W.2d 522 (Mich. 1979)). Furthermore, "knowledge or reckless disregard of falsity is required." *Id.* (citing Restatement (Second) of Torts § 593 cmt.c, §§ 594 and 646A).

[¶23.]     In this case, the trial court found that "Hanson's filing was malicious. He knew the Browns had rejected his daughter's offer on the property. He knew the electric bill issue and camping issue were illusory, false, and pre-textual. . . . Hanson intended not to enforce any legal rights he had, or in good faith thought he had, under the Agreement, but rather to prevent a sale of the Browns' property." The trial court found that Hanson (1) maliciously filed the letter and (2) knew or should have known that the statements in the letter were false. Hanson has not demonstrated that these findings are clearly erroneous and therefore the conditional privilege defense is not available to him.

[¶24.]     **2.      Whether the trial court erred in finding Hanson liable for tortious interference with a business contract.**

[¶25.]     The trial court found that Hanson tortiously interfered with the Browns' business contract with the Fords, i.e., the contract to sell the Fords the property. Hanson argues that he had a genuine and legitimate economic interest to protect when he recorded the May 19, 2006 letter. He claims that because of this interest he had an absolute privilege to place the public on notice by recording the letter.

[¶26.]     To establish a claim for tortious interference with a business relationship, a plaintiff must prove:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and, (5) damages to the party whose relationship or expectancy was disrupted.

*Selle v. Tozser*, 2010 S.D. 64, ¶ 15, 786 N.W.2d 748, 753 (citing *Dykstra v. Page Holding Co.*, 2009 S.D. 38, ¶ 39, 766 N.W.2d 491, 499); *St. Onge Livestock Co., Ltd. v. Curtis*, 2002 S.D. 102, ¶ 12, 650 N.W.2d 537, 541.

[¶27.]     Hanson does not argue that the elements of tortious interference have not been proven in this case; thus, we do not address them. Instead, Hanson argues that he had an interest to protect, which goes to whether filing the letter was an "unjustified act of interference." Specifically, the interest Hanson claims is placing the public on notice that camping was not allowed on the property.

[¶28.]     We do not find this "interest" persuasive. First, the Agreement was not so broad as to prohibit camping on the Browns' property; rather, the Agreement prohibited use of the water for non-domestic purposes. Additionally, we have previously stated that "self interest is not a defense where a party's conduct is improper." *Table Steaks v. First Premier Bank, N.A.*, 2002 S.D. 105, ¶ 27, 650 N.W.2d 829, 837 (credit card company unsuccessfully argued it was protecting its own interest when it terminated credit card processing agreement without notice, which the jury found to be an intentional and unjustified act of interference). The trial court did not err in finding Hanson committed tortious interference with a business contract.

[¶29.]    **3.    Whether the trial court erred in awarding the Browns attorneys' fees for Hanson's slander of title.**

[¶30.]    In their pleadings, the Browns requested relief "for all damages incurred by [them] arising out of [Hanson] slandering [Browns'] title on their property." The trial court awarded the Browns $21,618.70* in attorneys' fees under SDCL 43-30-9. The court also concluded an award of attorneys' fees was appropriate as special damages in a slander of title action, incurred to remove the cloud on the Browns' title. Both avenues of awarding attorneys' fees are issues of first impression in South Dakota. We address each approach in turn.

[¶31.]    An award of attorneys' fees is normally reviewed under the abuse of discretion standard. *Credit Collection Servs., Inc. v. Pesicka*, 2006 S.D. 81, ¶ 5, 721 N.W.2d 474, 476. Because there is no contract providing for attorneys' fees in this case, we must determine whether SDCL 43-30-9 authorizes an award of attorneys' fees. This is a statutory construction question, which is reviewed de novo. *Id.*

*Statute*

[¶32.]    SDCL 43-30-9 provides:

> No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land and in any action brought for the purpose of quieting title to land, if the court shall find that any person has filed a claim for the purpose only

---

\*    In its discussion regarding award of attorneys' fees, the trial court notes that the itemization of expenses submitted by the Browns begins July 11, 2006 and end February 17, 2008. Essentially, the expenses cover the action through the first appeal. The two-day court trial did not occur until July 2008. However, in discussing whether the amount of attorneys' fees was appropriate, the trial court noted the trial and extensive preparations and work by the attorneys after the trial was over. In determining whether the amount of attorneys' fees requested was appropriate and sought to remove the cloud of title, it is not clear that the trial court only considered the attorneys' work up until the first appeal was completed.

of slandering title to such land, he shall award the plaintiff all the costs of such action, including attorney fees to be fixed and allowed to the plaintiff by the court, and all damages that plaintiff may have sustained as the result of such notice of claim having been filed for record.

[¶33.] Actions to quiet title are very specific. Quiet title actions in South Dakota are conducted under SDCL ch. 21-41. Black's Law Dictionary defines "action to quiet title" as "a proceeding to establish a plaintiff's title to land by compelling the adverse claimant to establish a claim or be forever estopped from asserting it." 32 (8th ed. 2004). The Browns did not bring a claim under SDCL ch. 21-41, but rather a declaratory judgment action, common-law slander of title claim, and a claim for tortious interference of a business contract.

[¶34.] This Court has repeatedly stated that "words and phrases in a statute must be given their plain meaning and effect." *W. Consol. Coop. v. Pew*, 2011 S.D. 9, ¶ 34, 795 N.W.2d 390, 399 (citing *Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 15, 757 N.W.2d 756, 761). When the words and phrases of SDCL 43-30-9 are given their plain meaning and effect, the statute does not indicate a legislative intent to allow a court to award attorneys' fees in a slander of title action when the slander does not result in a quiet title action under SDCL ch. 21-41. The trial court erred in awarding attorneys' fees under SDCL 43-30-9.

### Special Damages

[¶35.] Our analysis of the attorneys' fees issue does not end with SDCL 43-30-9. The Restatement (Second) of Torts § 633(1)(b) (1977) provides: "The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to . . . the expense of measures reasonably necessary to counteract the publication,

including litigation to remove the doubt cast upon vendibility or value by disparagement." The majority of states that have addressed this issue have followed the Restatement approach and determined that attorneys' fees which flow directly from the disparagement of title are recoverable as damages in a slander of title action. *See Fountain v. Mojo*, 687 P.2d 496, 501 (Colo. App. 1984); *Gambino v. Boulevard Mortg. Corp.*, 922 N.E.2d 380, 423 (Ill. App. 1 Dist. 2009); *Wilcox Lumber Co., Inc. v. The Andersons, Inc.*, 848 N.E.2d 1169, 1171 n.1 (Ind. Ct. App. 2006); *Sullivan v. The Thomas Org.*, 276 N.W.2d 522, 526 (Mich. Ct. App. 1979) ("reasonable expenses incurred by the plaintiff in removing the cloud from his title were recoverable as damages in a disparagement of title action"); *Paidar v. Huges*, 615 N.W.2d 276, 280-81 (Minn. 2000) (holding that attorneys' fees are allowed in slander of title actions because "one party's tortious conduct necessitated litigation by the other party"); *Ellison v. Meek*, 820 So.2d 730, 738 (Miss. Ct. App. 2002); *Lau v. Pugh*, 299 S.W.3d 740, 749-50 (Mo. App. S. Dist. 2009); *Den-Gar Enters. v. Romero,* 611 P.2d 1119, 1124 (N.M. Ct. App. 1980) ("in a slander of title action, the amount of attorneys' fees incurred to quiet title is not allowed merely as an extra expense of the suit, but is a measure of damages itself."); *Brooks v. Lambert*, 15 S.W.3d 482, 485 (Tenn. Ct. App. 1999); *Gillmor v. Cummings*, 904 P.2d 703, 708 (Utah Ct. App. 1995) ("while special damages are ordinarily proved in a slander of title action by evidence of a lost sale or the loss of some other pecuniary advantage, attorney fees may be recoverable as special damages if incurred to clear title or to undo any harm created by whatever slander of title occurred"); *Rorvig v. Douglas*, 873 P.2d 492, 497 (Wash. 1994).

[¶36.]     Allowing recovery of attorneys' fees to restore a slandered title would not be without some analogous precedent in South Dakota. *Colton v. Decker*, 540 N.W.2d 172 (S.D. 1995). In *Colton*, the plaintiff bought a truck from the defendant. *Id.* at 174. While driving in Wyoming, the authorities discovered that the truck did not have matching VIN numbers. *Id.* at 174-75. The plaintiff went through significant legal hurdles to recover the truck in Wyoming. *Id.* at 175. Once he returned to South Dakota, the plaintiff sued the defendant under various theories, including breach of contract and breach of warranty of title. *Id.* The plaintiff recovered attorneys' fees, but only for what it cost to get the truck out of impound in Wyoming. *Id.* at 178. The plaintiff unsuccessfully argued for attorneys' fees for the suit against the defendant. *Id.*

[¶37.]     This Court has also authorized attorneys' fees in a case where the plaintiff incurred attorneys' fees to recover converted money. *Jacobson v. Leisinger*, 2008 S.D. 19, ¶ 13, 746 N.W.2d 739, 743. The fees were separate from the conversion action, and therefore "separable and recoverable." *Id.* We noted that "the damages must be bifurcated between 'attorney fees incurred as a result of the conversion litigation as compared to attorney fees incurred in recovering possession of the property. The former are not compensable, the latter are.'" *Id.* ¶ 14 (citing *Motors Ins. Corp. v. Singleton*, 677 S.W.2d 309, 315 (Ky. Ct. App. 1984)). Further, this Court recognized that "attorney fees are not generally recoverable in actions sounding in tort 'except those fees incurred in other litigation which is necessitated by the act of the party sought to be charged.'" *Id.* ¶ 15 (citing *Grand State Prop. Inc. v. Woods, Fuller, Shultz & Smith, P.C.*, 1996 S.D. 139, ¶ 19, 556 N.W.2d 84, 88;

*Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 763 (S.D. 1994)). This Court analogized the case to *Foster v. Dischner*, 51 S.D. 102, 212 N.W. 506 (1927). In that case, the plaintiff was awarded attorney fees incurred in releasing an unlawful levy of his property. Both *Jacobson* and *Foster* illustrate previous situations where this Court has found it appropriate to award attorneys' fees, which were necessitated by a party's actions, outside of a contract or specific legislative grant.

[¶38.] As in *Jacobson*, this "lawsuit is more complicated than the typical [slander of title] pleadings." *Jacobson*, 2008 S.D. 19, ¶ 17, 746 N.W.2d at 743. Here, Hanson filed his letter with the Meade County Register of Deeds, causing an exception to be placed on the Browns' title policy and interfering with the sale of the property to the Fords. Due to Hanson's failure to cooperate, the Browns were left with little choice but litigation. The Browns sued to determine if Hanson was entitled to rescind the Agreement, as purported in the filed letter. The expense that the Browns incurred in order to have the exception cleared from their title policy is a pecuniary loss directly caused by Hanson's conduct. *See id.* ¶ 14.

[¶39.] In this case, attorneys' fees were properly pleaded as special damages, incurred by the Browns to remove the disparagement on their title caused by Hanson's filed letter. The Browns' request for attorneys' fees appropriately includes amounts spent in bringing the declaratory judgment action through appeal on *Brown I*. Because Hanson was the cause of the litigation, as supported by the trial court's findings, attorneys' fees are recoverable in this action as special damages. The trial court is affirmed on the award of attorneys' fees as special damages.

[¶40.]    4.    **Whether the Browns are entitled to claim as compensatory damages the $6,300 credit they gave to the Fords.**

[¶41.]    The Browns and the Fords agreed that the Fords would be entitled to a credit in the amount of $6,300 on the purchase price as compensation for the Browns' delay in closing on the sale of the property. In consideration, the Fords released all the claims they "might" have against the Browns for the delay. The trial court awarded this amount to the Browns as compensatory damages, determining that "the $6,300 credit fairly and reasonably compensated the Browns for the release paid to Fords."

[¶42.]    The trial court noted that "assuming the Fords had some type of claim against the Browns, the Court cannot determine with absolute precision how much the Fords' undenominated claims are worth." The trial court, however, went on to note that the Browns "<u>had</u> to close the deal with the Fords. . . . More protracted litigation over this property and the uncertainty of closing, especially based on past experience, made the $6,300 seem a small price to pay. The $6,300 credit fairly and reasonably compensates the Browns for the release paid to Fords. This item and measure of damage is legally attributable to Hanson's sabotage."

[¶43.]    There is a rational relationship between the trial court's grant of $6,300 compensatory damages and the method it used. It is the exact amount of the credit that the Browns gave the Fords to gain a release from the claims they may have had against them for the delay in closing. Although there is no way to know exactly how much the Fords' claims would have been worth, $6,300 is reasonable under the circumstances of this case. Awarding the Browns $6,300 will make them

whole because that is the credit they gave the Fords, which they would otherwise have received. The award is affirmed.

[¶44.]    **5.    The Browns claim the trial court erred in the amount awarded for pecuniary damages.**

[¶45.]    The trial court awarded the Browns $3,965 in pecuniary damages on their slander of title and tortious interference with contract claims. First, the Browns argue that they are entitled to interest on the amount of money they would have "netted" at closing with the Fords, $187,804.00, had closing occurred as scheduled on July 11, 2006, because they were deprived of the use of that money for 353 days. Using the statutory rate of 10% as set by SDCL 21-1-13.1 governing prejudgment interest, the Browns request $18,214.48 in damages. Additionally, the Browns argue that they are entitled to prejudgment interest on $18,214.48 from the date the closing occurred until the date judgment was entered, which totals $5,429.42. Second, the Browns argue that they should have received prejudgment interest on the $6,300 awarded as compensatory damages, the $2,848 awarded for property taxes, and $4,871 awarded for interest payments the Browns made on their first mortgage. After the $10,481 in rent paid by the Fords is subtracted, the Browns argue that they are entitled to $32,193.00 in pecuniary damages exclusive of attorneys' fees and punitive damages. Because prejudgment calculations are done as a matter of law, the standard of review is de novo. *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 2006 S.D. 72, ¶ 26, 720 N.W.2d 655, 663.

[¶46.]    We begin with the Browns' assertion that they are entitled to interest on the amount of net proceeds they would have received had the sale with the Fords occurred as planned. The trial court rejected the Browns' calculation of damages.

Specifically, the trial court found that the Browns failed to offer evidence of a market based measure of damages on their inability to access the sale proceeds. Furthermore, the trial court explained that "the 10% rate does not necessarily precisely measure a proven market rate of return the Browns could have received on $187,804 for 353 days in between the aborted July 2006 closing [and] June 29, 2007." Additionally, the trial court noted that the Browns still owned the real property with a net worth of $187,804, and they received rent from June 2006 to June 2007. Because the trial court did not err in finding that the Browns did not provide adequate proof of loss due to their inability to access the net proceeds, this issue is affirmed.

[¶47.] We now address the Browns' argument regarding prejudgment interest on the damages they were awarded, exclusive of punitive damages and attorneys' fees. SDCL 21-1-13.1 provides that "[a]ny person who is entitled to recover damages . . . is entitled to recover interest thereon." The trial court awarded interest on the pecuniary damages beginning June 29, 2007, which is the date the trial court determined the damage occurred. As explained earlier, the trial court reached the pecuniary damage amount by adding the payments made on the first and second mortgages, the property taxes and the $6,300 compensatory credit, and then subtracting the amount of rent the Browns received from the Fords. Prejudgment interest was awarded on the final figure, $3,965. If we were to order prejudgment interest on the mortgage payments, property taxes, and compensatory credit, the Browns would receive "double" recovery. Accordingly, the trial court did not err in its calculations of prejudgment interest.

[¶48.]     The trial court appears to have made an inadvertent error while calculating damages. Although it repeatedly stated it was awarding $6,300 as a compensatory credit, in its calculations it used $6,500. This means that the total damages should be $15,015. Additionally, the trial court subtracted the amount of rent the Fords paid to the Browns in reaching the pecuniary damage figure. The exhibit indicating the actual amount of rent paid was not admitted into evidence, although the Browns' counsel uses the figure $10,481. The trial court used $11,250 after indicating the Browns had received rent for 11.5 months. However, $900 rent per month for 11.5 months is actually $10,350. If the Fords had paid rent for 12.5 months the total rent paid would be $11,250. Therefore, the calculation should be redone to reflect a pecuniary loss of $6,300 and a determination of the actual amount of rent the Fords paid the Browns. The proper rent amount should be subtracted from $15,015 for the net pecuniary loss. Additionally, the trial court indicated that it calculated punitive damages by multiplying the net pecuniary loss by 3.5. Because the net pecuniary loss has changed, the trial court should re-examine the punitive damages accordingly.

[¶49.]     In conclusion, after analyzing this issue, the trial court found that $3,965 would reasonably and fairly compensate the Browns for the pecuniary harm they suffered by Hanson's conduct. Prejudgment interest at 10% was awarded on the pecuniary damages from June 29, 2007. The trial court was correct in theory. We affirm the grant of damages for net pecuniary loss, but remand for a correction of the figures used to calculate the pecuniary damages.

**CONCLUSION**

[¶50.]     The trial court did not err in finding Hanson committed slander of title and tortious interference with a business contract.  The trial court erred in awarding attorneys' fees under SDCL 43-30-9, but not in awarding them as special damages in the slander of title cause of action.  The remaining damages and prejudgment interest awards are correct in theory, but remanded for a correction on the figures used, as explained above.  The Browns also request appellate attorneys' fees in the amount of $1,160.70 under SDCL 15-26A-87.3 because Hanson has argued that the trial court was incorrect in finding he slandered the Browns' title. We grant the Browns' request.

[¶51.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.