#30420, #30434-aff in pt & rev in pt-PJD
**2025 S.D. 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JED SPECTRUM INCORPORATED, a
South Dakota corporation, and BIGHORN
CONSTRUCTION, LLC, a South Dakota
limited liability company,                                Plaintiffs and Appellants,

        v.

KEITH STOAKES, and any person in
possession,                                                         Defendant and Appellee,

        and

BANKWEST, INC.,                                             Defendant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHAEL W. DAY
Judge

\* \* \* \*

JOEL E. ENGEL III
JORDAN J. FEIST of
Woods, Fuller, Shultz &
    Smith, P.C.
Sioux Falls, South Dakota                           Attorneys for plaintiffs
                                                                      and appellants.


JESS M. PEKARSKI
PHILIP R. STILES
MICHAEL F. STEVE
GARRETT J. KEEGAN of
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
Rapid City, South Dakota                            Attorneys for defendant
                                                                      and appellee Keith Stoakes.

\* \* \* \*

CONSIDERED ON BRIEFS
MARCH 19, 2024
OPINION FILED **07/02/25**

DEVANEY, Justice

[¶1.]        Bighorn Construction, LLC (Bighorn) and JED Spectrum, Inc. (JED)

each filed a mechanic's lien against property owned by Keith Stoakes and thereafter

jointly instituted this action to foreclose on the liens.  Stoakes answered, denying

the validity of the liens and asserting counterclaims for slander of title against both

companies and breach of contract, promissory estoppel, and fraud against JED.

After a three-day bench trial, the circuit court issued amended findings of fact and

conclusions of law denying JED's and Bighorn's claims for lien foreclosure and

ruling in favor of Stoakes on his slander of title claims against both companies.  The

court awarded Stoakes $252,225.27 in damages on his slander of title claims and

$33,394.20 in attorney fees.  The court denied relief on the parties' remaining

claims.  Bighorn and JED appeal, arguing the court erred in ruling in favor of

Stoakes on his slander of title claim and in calculating damages.  By notice of

review, Stoakes challenges the denial of relief on his promissory estoppel claim and

associated request for attorney fees.  We reverse in part and affirm in part.

### Factual and Procedural Background

[¶2.]        In June 2018, Keith Stoakes and his fiancé Sheri made an offer to Barb

Morris to purchase two lots (Lots 12 and 13) in the Mountain Shadows Ranch

Estates subdivision in Meade County.  At the time they made the offer, they did not

know that Jerome (Jerry) and Bonnie Pauling, who owned multiple lots in the

subdivision, held a right of first refusal on both lots. Jerry contacted Stoakes to

advise him that he had a right of first refusal on both properties, but he expressed a

willingness to forego exercising the right so that Stoakes could purchase both lots if

Stoakes would agree to change the property line for Lot 12 to add approximately a half of an acre to the Paulings' adjacent lot. Stoakes did not agree and instead decided not to purchase Lot 12. The Paulings nevertheless waived their right of first refusal on Lot 13, and Stoakes and Sheri purchased that lot.

[¶3.]      After the purchase, Jerry befriended Stoakes and Sheri and welcomed them to the community. Jerry also helped them make decisions related to building a home on their property. Jerry has over thirty years of experience in the construction industry and is the sole owner and operator of Bighorn. He is also the sole shareholder of JED, a company he uses to manage his rentals. Stoakes decided, after considering his options, to install a prefabricated home on his property. By this time, he and Sheri had gotten married and divorced, and she deeded her interest in the property to him.

[¶4.]      Prior to Stoakes obtaining financing, Jerry proposed to him that Bighorn perform the excavation work for the placement of his home. To save Stoakes money, Jerry agreed to allow Stoakes to help with the labor on the project. Stoakes agreed, and Bighorn provided him an estimate indicating that Bighorn could complete the work for approximately $14,800, which included excavation, installing a water line and two septic tanks, gravel and dirt back fill, and trucking. Jerry also proposed that because Lot 13 did not have a water source, Stoakes could enter into an agreement with JED for a shared well system. No agreement was reached regarding the well system at that time.

[¶5.]      Prior to construction, which did not begin until 2020, Stoakes and Jerry again discussed the topic of Stoakes connecting to JED's well. Though the

specific terms are disputed, Jerry testified that they discussed a concept whereby all five lots in the subdivision would connect to the well system and each lot owner would pay one-fifth of the cost of the construction of the well. Both Stoakes and Jerry testified that they discussed an arrangement in which Stoakes would pay JED $24,000 (one-fifth of the construction costs) in exchange for Stoakes having a reliable water source and a one-fifth share in the well system. According to Stoakes, Jerry provided him an estimate that was issued by Bighorn. The estimate, dated June 25, 2020, is addressed to JED and contains a detailed list of the cost of materials and labor for a total cost of $23,956.77, representing what Jerry characterized as one-fifth of the homeowner's water system connection charge.

[¶6.] Using this estimate from Bighorn for the excavation and other work on Stoakes's property, along with the expected $24,000 expense for the shared well, Stoakes secured a construction mortgage in November 2020 from BankWest for $292,968. Pennington Title Company was responsible for issuing payments to contractors for associated construction costs, including site blasting, excavation and dirt work, and installation of a waterline.

[¶7.] Construction on the property began in December 2020, and while work was underway by Bighorn, Jerry and Stoakes negotiated terms for a written shared well agreement between JED and Stoakes. Jerry and Stoakes retained separate counsel and exchanged draft agreements, through counsel, that each believed accurately reflected the terms of their oral discussions. In January 2021, Stoakes connected to JED's well and began drawing water, though no written well agreement had been reached at that time. Stoakes testified that he connected to

the well because of the earlier assurance from Jerry that he would have access to a reliable water source and be a one-fifth owner in the well system.

[¶8.]    Bighorn finished its work on Stoakes's property and sent Stoakes an invoice for $42,674.  Stoakes claimed that Jerry provided no explanation for the substantial difference between the $14,800 estimate and this later invoice amount.  Eventually, Jerry and Stoakes negotiated the total invoice down to $31,728.61, and on June 15, 2021, Bighorn sent Stoakes a new invoice seeking payment for this amount.  The invoice described the work performed by Bighorn as: "[i]nstallation of the water line from well house to home"; "[i]nstallation of water line to supply camper pad"; and excavation work, back fill for foundation, footings, walls, and septic tanks.

[¶9.]    Stoakes submitted Bighorn's invoice to Pennington Title, and Pennington Title issued Bighorn a check for $31,728.61 on June 29, 2021.  The top of the check contained the following statement: "THIS IS A LIEN WAIVER CHECK."  A representative from Pennington Title testified that the company stamps its checks with this statement as a standard practice to indicate that the contractor was "paid for services rendered."  Bonnie, who was the bookkeeper for Bighorn and JED, asked Stoakes to have the check reissued without the lien waiver stamp.  Stoakes testified that he did not oppose the request but that the check was not reissued because of the company's policy to include the lien waiver notation.  At trial, a representative from Pennington Title testified that the company would not have reissued a check without the lien waiver because it "goes against policy and procedure."

[¶10.]     Jerry testified that he did not cash the check on behalf of Bighorn because he believed that if he did so, he would be waiving claims on other invoices. He claimed JED issued an invoice to Stoakes in June 2021 for $24,000 for a "Well Hook Up Fee." Stoakes disputed that he received such an invoice *from JED*. However, he acknowledged that in the midst of a continued dispute over the terms of a shared well agreement, he received an invoice on *Bighorn's* letterhead dated August 1, 2021, for $24,000 for "[m]aterials, labor, and water [i]nstallation of shared well [i]nfrastructure." At trial, Stoakes introduced, as evidence, letters exchanged between the parties regarding their continuing dispute.

[¶11.]     In a letter dated July 15, 2021, Stoakes expressed his frustration with what had transpired between the parties and advised Jerry that he would be proceeding with his own well and would pay JED $50 for each month he had used the well connection, from January through July of 2021. Stoakes testified that he issued JED a check for $350, dated July 14, 2021, but Jerry advised him in a letter dated July 27, 2021, that JED would not accept this check as payment and would instead be taking legal action to collect the $24,000 owed to JED for what Jerry deemed to be a hookup fee. Jerry thereafter sent Stoakes the August 1 invoice for $24,000 from Bighorn for the installation of the shared well infrastructure. In response, Stoakes advised Jerry by letter that he did not owe anything for this infrastructure because he only connected to this well with the understanding that he would have joint *ownership* of the well system. By this point, the parties' otherwise cordial relationship had ended.

[¶12.]     On September 29, 2021, Bighorn filed a mechanic's lien against Stoakes's Lot 13 for $31,728.61, representing "[t]he services and materials . . . contributed by the lien claimant . . . for excavating house pad and septic tanks and for adding fill and other improvements made" on Stoakes's property. JED filed a separate mechanic's lien on the same date on the same lot for $24,000, representing "[t]he services and materials . . . contributed by the lien claimant . . . for materials, labor, and water for installation of shared well infrastructure and other improvements made" on Stoakes's property. In October 2021, Bighorn and JED filed amended mechanic's liens to correct the name of the county from Butte to Meade.

[¶13.]     Stoakes did not remit payment and testified that he demanded that Bighorn and JED remove their liens from his property. Bighorn and JED did not do so, and on November 10, 2021, they commenced a joint suit to foreclose on the liens.[1] They alternatively asserted claims for breach of contract, promissory estoppel, and unjust enrichment. After Bighorn and JED filed an amended complaint on November 19, Stoakes filed an answer denying the validity of both liens. He alleged, in part, that Bighorn has been paid in full on its invoice and that JED did not furnish any work, labor, services, or material to his property. Stoakes also filed a counterclaim alleging slander of title against both Bighorn and JED, as

---

1.     BankWest joined the action as the mortgage holder; however, by stipulation of the parties, BankWest did not appear at trial. Likewise, although BankWest was served with the notice of appeal, it did not submit a brief or take any position on the issues in this appeal.

well as breach of contract, promissory estoppel, and fraud against JED related to the shared well agreement.

[¶14.]	During a three-day bench trial beginning in December 2022, multiple witnesses testified, including Jerry, Bonnie, Stoakes, and representatives from BankWest and Pennington Title. After Bighorn and JED rested their case, Stoakes moved for a judgment as a matter of law on the count seeking to foreclose on the liens. Stoakes argued that there was no legally sufficient basis to find for Bighorn on its lien because it has been fully paid and Jerry admitted at trial that Bighorn had not performed any work on Stoakes's property since receiving payment. In regard to JED, Stoakes asserted that the lien is invalid because JED did not do any work on his property, the lien was untimely filed, the attached invoice is from Bighorn, not JED, and the invoice is not sufficiently itemized. The court denied Stoakes's motion as it related to Bighorn's lien but granted the motion as to JED's lien. The court determined that JED's lien was untimely filed and insufficiently itemized. Stoakes then presented his case, and after both parties rested, the court invited the parties to submit proposed findings of fact and conclusions of law.[2]

[¶15.]	The parties submitted their respective proposed findings and conclusions and the circuit court thereafter entered its findings of fact and conclusions of law. The court determined Bighorn did not have reasonable grounds to file the lien on Stoakes's property given that Stoakes had already tendered

---

2.	Bighorn and JED moved for a judgment as a matter of law on all of Stoakes's claims asserted in his counterclaim. After considering the parties' arguments, the court granted the motion only with respect to Stoakes's fraud claim.

payment in full on Bighorn's invoice. In light of that ruling and its previous determination that JED's lien was invalid, the court dismissed Bighorn's and JED's respective foreclosure claims. The court also dismissed both parties' breach of contract claims and Bighorn's and JED's unjust enrichment and promissory estoppel claims.

[¶16.] However, the circuit court found in favor of Stoakes on his promissory estoppel claim against JED, finding that Stoakes reasonably relied on JED's promise that he would have a reliable water system and a one-fifth ownership interest in JED's well system. The court awarded Stoakes $74,996.94 in damages on his promissory estoppel claim based, in part, on Jerry's testimony that it would cost Stoakes $62,000 to construct a well on his own property.

[¶17.] The court also found in favor of Stoakes on his slander of title claims against Bighorn and JED. The court additionally held that Bighorn and JED violated SDCL 44-9-22 when the entities failed to discharge their respective liens by filing a satisfaction after a demand for such was made by Stoakes. In regard to damages on the slander of title claims, the circuit court found that because of the liens, Stoakes was not able to convert his construction loan to a permanent mortgage and close on such mortgage in October or November 2021 at a 2.75% interest rate. Instead, he would be facing a thirty-year mortgage at a 6.125% interest rate. Based on the difference in the interest rates over a thirty-year period, plus the $500 Stoakes paid to extend his construction mortgage and the $18,544 he paid in interest on his construction loan when he could have been paying both principal and interest on a permanent loan, the court awarded Stoakes $252,225.27

in damages on the slander of title claims. The court also awarded Stoakes attorney fees at an amount to be determined.

[¶18.] After Stoakes filed a motion for $66,788.40 in attorney fees, Bighorn and JED objected, asserting that Stoakes is not entitled to attorney fees under SDCL 44-9-22 or SDCL 44-9-42 as a matter of law and further argued no such fees are warranted under the circumstances. Bighorn and JED also filed a motion for a new trial on damages based on newly discovered evidence that Stoakes sold Lot 13 and would thus not be paying an increased interest rate for the next thirty years.[3] They also requested a new trial on the slander of title and promissory estoppel claims because in their view, multiple findings of fact and conclusions of law related to those claims were not supported by the evidence presented at trial.

[¶19.] The circuit court held a hearing and denied the motion for a new trial based on newly discovered evidence and also denied the claim that the evidence was insufficient to support the court's rulings related to slander of title. However, the court took the propriety of its ruling on Stoakes's promissory estoppel claim under advisement. Thereafter, the court issued amended findings of fact and conclusions of law reversing its determination in favor of Stoakes on his promissory estoppel claim and dismissing that claim. The court also reduced Stoakes's attorney fee award accordingly. The court's final judgment awarded Stoakes $252,225.27 in damages on the slander of title claims and $33,394.20 in attorney fees.

---

3. In support of his objection to Bighorn's and JED's motion for a new trial, Stoakes submitted an affidavit attesting that he has "not listed the real property for sale" and has "not entered into any contracts to sell the real property since the [c]ourt entered its order on May 10, 2023."

[¶20.]	Bighorn and JED appeal, asserting the following restated issues:

1.	Whether the evidence supports the circuit court's findings in favor of Stoakes on his slander of title claims.

2.	Whether the circuit court erred in concluding that Bighorn and JED violated SDCL 44-9-22.

3.	Whether the circuit court erred in calculating Stoakes's damages by not reducing the amount to its present value.

By notice of review, Stoakes asserts the circuit court erred in denying relief on his promissory estoppel claim and reducing his attorney fee award.

**Standard of Review**

[¶21.]	This Court reviews the circuit court's legal determinations, including questions of statutory application, under the de novo standard of review with no deference to the circuit court's decision. *In re I.A.D.*, 2023 S.D. 36, ¶ 16, 993 N.W.2d 911, 916. The circuit court's factual findings are reviewed under the clearly erroneous standard of review. *Smith v. WIPI Grp., USA, Inc.*, 2023 S.D. 48, ¶ 34, 996 N.W.2d 368, 378. We have explained that the Court's function, when applying the clearly erroneous standard, is to "determine whether the decision of the lower court lacks the support of substantial evidence, evolves from an erroneous view of the applicable law or whether, considering the entire record, we are left with a definite and firm conviction that a mistake has been made." *State v. Dreps*, 1996 S.D. 142, ¶ 8, 558 N.W.2d 339, 341 (quoting *State v. Baysinger*, 470 N.W.2d 840, 843 (S.D. 1991)). Whether a legal standard required by statute or other governing legal authority is met by the established facts is generally a matter of law that is fully reviewable by this Court. *See, e.g.*, *In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 11, 781 N.W.2d 213, 218.

## Analysis and Decision

### 1. Whether the record supports the circuit court's findings in favor of Stoakes on his slander of title claims.

[¶22.]    Before addressing the parties' arguments relating to this issue, we note that our prior cases addressing slander of title claims have not articulated a clear standard by which such claims are to be evaluated, particularly with regard to the requisite state of mind of the person or entity accused of publishing a falsehood. The Court's analysis in *Gregory's, Inc. v. Haan* contains the first extensive review of the law on slander of title claims, also called disparagement of title. 1996 S.D. 35, 545 N.W.2d 488. In that regard, the Court quoted this general statement from the Restatement regarding what must be shown to establish liability for publication of a falsehood:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
>> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>>
>> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Id.* ¶ 12, 545 N.W.2d at 493 (quoting Restatement (Second) of Torts § 623A (1977)). The Court then quoted the more specific Restatement provision regarding liability for disparagement of property that aligns with the alternative "should recognize" language in § 623A(a):

> The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a false

> statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property.

*Id.* (quoting Restatement (Second) of Torts § 624 (1977)). Thereafter, the Court crafted four elements that must be met to establish a claim for slander of title:

> [The] publication of the falsehood: (1) was derogatory to the title to plaintiff's property, its quality, or plaintiff's business in general, calculated to prevent others from dealing with plaintiff or to interfere with plaintiff's relations with others to plaintiff's disadvantage (often stated as malice); (2) was communicated to a third party; (3) materially or substantially induced others not to deal with plaintiff; and (4) resulted in special damage.

*Id.* (citing W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 128 (5th ed. 1984)).[4]

[¶23.] The last three elements identified by the Court focus on the act of publishing the falsehood and the harm caused by the publication. None of these three elements are at issue here. Rather, Bighorn's and JED's arguments on appeal concern whether the circuit court erred in its findings on the first element; in particular, whether Jerry acted with malice in causing the liens to be filed.

[¶24.] As to that inquiry, the Court's additional discussion in *Gregory's* relating to the lien filer's asserted privilege defense is implicated. After identifying the four elements that must be shown to prove a slander of title claim, the Court in

---

4. The latter portion of the first element identified in *Gregory's* only partially aligns with the characterization in subsection (a) of the Restatement § 623A regarding a filer's intent. The Court did not include the less stringent alternative that the publisher "recognizes or *should recognize*" that the publication is likely to result in harm. Restatement (Second) of Torts § 623A (emphasis added).

*Gregory's* examined "whether the filing of a false materialman's lien is privileged." *Id.* ¶ 12. While the Court rejected the lien holder's claim that the absolute privilege under SDCL 20-11-5(2) applies, the Court determined that such filings carry a "conditional privilege." *Id.* ¶¶ 13–14, 545 N.W.2d at 493–94. The Court then observed that "[t]he privilege is subsumed in the requirement that the person suing for disparagement of title must show malice or that the lien filer had an illegitimate purpose." *Id.* ¶ 14, 545 N.W.2d at 494.

[¶25.]     Following this observation, the Court's further explanation of what would or would not be sufficient to either prove the disparagement of title claim or to overcome the conditional privilege has resulted in a not-so-clear standard to be applied in future cases. In particular, the Court intermingled objective and subjective standards derived from other jurisdictions and secondary sources that are inherently inconsistent. *Id.* (referring to whether a lien filer acted "in the *reasonable* belief that the filing was valid[,]" whether the lien was "not filed in *good faith*[,]" and whether there was "*knowledge or reckless disregard* of falsity[.]") (emphasis added).[5]

[¶26.]     Ultimately, the Court in *Gregory's* did not have to grapple with the various iterations of what constitutes a conditional privilege or with how the conditional privilege relates to the Court's four-part test to prove a disparagement

---

5.     In a "Special Note on Conditional Privileges and the Constitutional Requirement of Fault," the Restatement similarly notes the "inherent conflict between a requirement of negligence *or worse* as to truth or falsity" and a requirement of a "lack of reasonable grounds for belief in truth (the equivalent of negligence as to truth or falsity)[.]" Restatement (Second) of Torts ch. 5, topic 3, spec. note (1977) (emphasis added).

of title claim. Because the circuit court had incorrectly dismissed the slander of title claim on summary judgment, this Court reversed and remanded for further proceedings. *Id.* ¶ 15. Further, although the Court in *Brown v. Hanson* quoted the four-part test and statements on conditional privilege from *Gregory's*, including the same formulations as to what must be shown with respect to the filer's knowledge, intent, or state of mind, the Court did not address the apparent inconsistencies. 2011 S.D. 21, ¶ 23, 798 N.W.2d 422, 429 (quoting the four elements and referring to a filer's good faith, reasonable belief, and what he knew or should have known). Rather, it appears that this Court's determination in *Brown* that the circuit court did not clearly err in its finding that the defendant "maliciously filed the letter" effectively neutralized the reference to the inconsistent standards from *Gregory's*. *See id.*

[¶27.] To better understand the genesis of the objective and subjective standards noted in *Gregory's*, we review some of the secondary sources cited in *Gregory's* regarding how the law on false publications has evolved. In particular, after noting that "[t]he basis of the defendant's liability for the publication has given considerable difficulty[,]" Prosser observed that "[i]t is very often said that proof of 'malice' on the part of the defendant is essential to the cause of action." *Prosser and Keeton on the Law of Torts* § 128, at 968. However, Prosser observed that courts have offered differing views on what is required to show malice, views that are often dependent on whether there is a recognized privilege at stake. *Id.* Prosser further explained that when a privilege is not at stake, some courts presume malice from the mere fact of publication, while others have said it is shown

by an "intent to publish . . . without justification, cause, or excuse." *Id.* After noting

that a presumption of malice from the act of filing would mean a defendant is

strictly liable for the false publication regardless of "his innocence, good intentions

or honest belief[,]" Prosser related that "[i]t has been forcefully argued [ ] that the

cases do not sustain strict liability." *Id.* at 969. Instead, liability exists only "when

the defendant knowingly or recklessly speaks a falsehood" or "acts from a spite

motive and out of the desire to do harm for its own sake." *Id.*

[¶28.]     In Prosser's view, the solution as to what state of mind or degree of

fault must be shown to support liability "may lie in the decisions of the Supreme

Court, which, in the personal defamation cases, have required some showing of fault

as a matter of Constitutional law." *Id.* at 970 (citing *New York Times Co. v.*

*Sullivan*, 376 U.S. 254 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).

Prosser further recognized that the Restatement (Second) of Torts followed this line

of reasoning, proposing that liability be based "upon defendant's knowing or

reckless falsehood." *Id.* (citing Restatement (Second) of Torts § 632A). Thus, under

the Restatement's approach, negligence would be insufficient, and "liability would

be placed squarely on serious fault[.]" *Id.* Under such an approach, according to

Prosser, "the confusing question of presumptions would pass out of the picture

entirely and to a large extent the matter of privileges, with their shifting burdens of

proof, would likewise be avoided." *Id.*

[¶29.]     From our review of the above explanations as to how the competing

principles have evolved in this area of the law, it appears that the Court in

*Gregory's* drew from both Prosser and the Restatement when it recognized that the

conditional privilege "is subsumed in the requirement that the person suing for disparagement of title must show malice or that the lien filer had an illegitimate purpose." 1996 S.D. 35, ¶ 14, 545 N.W.2d at 494. It also appears that while the Court included language in line with some of the earlier views utilizing a negligence standard to assess liability on a slander of title claim, the Court ultimately landed on the more stringent requirement that "knowledge or reckless disregard of falsity" be shown. *Id.*

[¶30.] Indeed, this standard aligns with how this Court has defined malice in other types of defamation cases. *See Tibke v. McDougall,* 479 N.W.2d 898, 906 (S.D. 1992) (malice requires evidence of "a reckless disregard for the truth on the part of the accused"); *Kieser v. Southeast Props.,* 1997 S.D. 87, ¶ 15, 566 N.W.2d 833, 837–38. As the Court explained, "[t]he real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether *he in fact* entertained serious doubts as to the truth of his publications." *Kieser,* 1997 S.D. 87, ¶ 15, 566 N.W.2d at 838 (emphasis added) (quoting *Tibke,* 479 N.W.2d at 906). "Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* (quoting *Janklow v. Viking Press,* 459 N.W.2d 415, 419 (S.D. 1990), *overruled on other grounds by Paint Brush Corp., Parts Brush Div. v. Neu,* 1999 S.D. 120, 599 N.W.2d 384). "[T]he evidence must permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Harvey v. Reg'l Health Network, Inc.,* 2018 S.D. 3, ¶ 28, 906 N.W.2d 382, 391 (alteration in original) (citation omitted).

[¶31.]     Therefore, upon careful examination of *Gregory's*, it is evident that to establish malice, the plaintiff must first prove that the publication at issue was false and that the publisher *knew* of the falsity or *recklessly* disregarded it. Such knowledge or reckless disregard exists when the evidence establishes that the publisher in fact knew the publication was false or entertained serious doubts as to its truth. What a reasonable person should have known or recognized has no bearing on this determination. Because this stringent requirement necessarily defeats the privilege, there is no need to separately analyze what must be shown to overcome the conditional privilege to file a mechanic's lien.

[¶32.]     Therefore, to prevail on a slander of title claim, the following elements must be proven:

> 1)     the publisher knew of, or recklessly disregarded, the falsity of the publication;
>
> 2)     the publication was derogatory to the title to plaintiff's property, its quality, or plaintiff's business in general, calculated to prevent others from dealing with the plaintiff or to interfere with the plaintiff's relations with others to the plaintiff's disadvantage;
>
> 3)     the publication was communicated to a third party;
>
> 4)     the publication materially or substantially induced others not to deal with the plaintiff; and
>
> 5)     the publication resulted in special damages.

*Gregory's*, 1996 S.D. 35, ¶ 12, 545 N.W.2d at 493. With regard to the requirement in the second element that the publication was "calculated" to cause harm, it is apparent that this element requires an *intentional* act because the Court did not include the less stringent alternative used in § 623A(a) of the Restatement

regarding what the publisher "should recognize." Restatement (Second) of Torts § 623A.

[¶33.] Here, Bighorn and JED dispute whether the evidence showed malice, i.e., whether Jerry knew or recklessly disregarded the falsity of the mechanic's liens at issue and whether he caused the liens to be filed with the intent to harm. They note that Jerry hired an attorney to file the liens and to institute this action to enforce them. They also refer to Jerry's testimony that he believed if he cashed the check for Bighorn's bill with the lien waiver notation, it would preclude him from trying to collect the money he thought he was owed for Stoakes's share of the water system. In their view, the record shows only that Jerry believed, albeit mistakenly, in the validity of his claim and that he filed the liens "to enforce legal rights he had 'or in good faith thought he had' related to the services provided to Stoakes." They therefore claim that the court erred in finding in favor of Stoakes on his slander of title claims.

[¶34.] The circuit court's amended findings of fact and conclusions of law separately address Bighorn's and JED's respective liens; therefore, we do the same in our review of the circuit court's findings on Stoakes's slander of title claims.

a. *Bighorn's mechanic's lien*

[¶35.] The circuit court did not enter a finding that Jerry acted with malice in causing Bighorn's mechanic's lien to be filed. The court did enter a finding (designated as conclusion) that Jerry intended the lien to disparage or cast doubt on Stoakes's lot, but the court explained its reason for this finding by stating, "or [he] would not have filed the mechanic's lien against" the lot. The court also entered a

finding that Bighorn knew or acted in reckless disregard *in filing* the lien after receiving a check for payment of the full amount. However, the court did not enter a finding stating that Bighorn knew the lien was false or entertained serious doubts as to its truth. Instead, the court entered findings relating to what Bighorn *should have* known. The court noted that a lien waiver, which the check at issue contained, waives only the portion of a claim that is paid. The court then noted that Bighorn never furnished additional services, material, or labor for which it could have filed another lien, and that Bighorn received a demand to remove the liens. The court concluded that for these reasons, Bighorn had "no reasonable grounds" to believe it was entitled to such lien.[6] Notably absent from the court's findings is any comment on, or assessment of, Jerry's professed belief that the lien waiver would impact his ability to collect what he thought was due on the water system agreement, nor did the court's findings acknowledge the fact that Jerry was relying on the advice of counsel when filing the liens.[7]

---

6. This enumerated conclusion also contains a statement that Bighorn violated SDCL 44-9-22, a statute relating to a failure to deliver a satisfaction of a lien within ten days after a written demand to do so. For reasons explained in our analysis of the issue addressing the court's ruling that Bighorn and JED violated SDCL 44-9-22, this statute is not applicable here. It also appears that the conclusions proposed by Stoakes and adopted by the circuit court to support a violation of SDCL 44-9-22 incorrectly incorporated express language found in SDCL 44-2-9, i.e., "reasonable grounds" and a "willfully made false substantial statement." However, in *Gregory's*, we determined that SDCL 44-2-9 applies to liens on personal property and deemed it "inapplicable to [a] filing [of] a false or unfounded materialman's lien under SDCL ch. 44-9." 1996 S.D. 35, ¶ 11, 545 N.W.2d at 492.

7. As noted by Prosser, albeit when discussing what the publisher of the statement at issue must show to prevail on a conditional privilege defense, "a genuine belief in [the] truth is sufficient, however unfounded or unreasonable

(continued . . .)

[¶36.]     As noted in the discussion above, to presume malice from the act of filing would essentially hold a defendant strictly liable for a false publication. To sustain a conclusion that the elements of a slander of title claim had been met, there must be a finding regarding what Jerry subjectively knew or recklessly disregarded as to the truth or falsity of the liens. Instead, Stoakes's case, and the circuit court's findings and conclusions, rested on the premise that Jerry's beliefs were not reasonable.

[¶37.]     These findings are insufficient to establish the elements of a slander of title claim. More importantly, however, the evidence in the record before us is insufficient as a matter of law to support a finding of malice. There was no evidence presented that Jerry subjectively knew the information in the Bighorn lien statement was false or that he entertained serious doubt as to its validity. Stoakes did not make any attempt to controvert Jerry's testimony that he believed he was still owed $31,728.61 for the excavation work on Stoakes's property. The undisputed evidence shows that Stoakes tendered payment, but Jerry never negotiated the check nor receipted payment. Jerry clearly communicated to Stoakes he would not do so unless the lien waiver language was removed from the check. Jerry and Stoakes were never able to resolve Jerry's concerns regarding the lien

---

(. . . continued)
it may be." *Prosser and Keeton on the Law of Torts* § 128. Prosser further explained that "the absence of probable cause for the belief may permit the jury to infer that it does not exist, but it is not necessarily conclusive;" and while not determinative, the advice of counsel "may constitute evidence in favor of good faith[.]" *Id.*

waiver language and the check was never cashed.[8] We therefore reverse the court's holding in favor of Stoakes on his slander of title claim against Bighorn.

### b. JED's mechanic's lien

[¶38.] As to JED's lien, the circuit court did not enter *any* findings on the four elements of a slander of title claim identified in *Gregory's*, nor did the court enter a finding that Jerry knew of the lien's falsity or recklessly disregarded the truth. Rather, the court found that Jerry "had *no reasonable* grounds to believe [JED] was entitled to such lien" and that he "willfully made false substantial statements *by filing* the JED Spectrum lien and fail[ing] to discharge the JED Spectrum lien" after receiving a written demand to remove the lien from Lot 13. (Emphasis added.) Rather than addressing the slander of title elements, these findings are tied to the court's conclusion that JED is liable to Stoakes under SDCL 44-9-22 for not executing and delivering a written satisfaction of such lien after Stoakes demanded the lien be discharged. For the reasons explained below, this statute is not applicable to the circumstances in this case.

[¶39.] But even if the court intended such findings to also relate to whether Jerry acted with malice, as we noted with respect to the court's findings related to Bighorn's lien, the reference to Jerry willfully making false statements improperly

---

8. Stoakes suggests that Jerry was reckless in failing to acknowledge payment and negotiate the check because there was no other work performed on the property after Bighorn submitted an invoice for payment. But the undisputed evidence shows there was still an outstanding dispute concerning payment for the cost of the well system that benefitted Stoakes's property and that Jerry believed negotiating the check could compromise this claim. Even if Jerry was incorrect in his belief concerning the lien waiver language, this evidence does not support a showing of malice.

*imputes* malice from the *act of filing* itself. Moreover, the finding that Jerry had no reasonable grounds to file the lien incorrectly applies an objective, rather than a subjective standard regarding what Jerry actually knew or believed.

[¶40.] Regardless of whether the claimed lien was in fact false, the evidence in this record was insufficient as a matter of law to show that Jerry knew or recklessly disregarded the falsity of the claim. It was clear from the testimony and evidence admitted that Jerry believed Stoakes owed him $24,000 for his portion of the expenses incurred to construct a shared well system that benefitted Stoakes's property. Further, it is undisputed that the parties had orally discussed such an arrangement, the well was constructed, and Stoakes connected to the well and drew water from it for several months while the parties were attempting to memorialize in writing the terms of what each deemed to be their oral agreement. Although they were ultimately unable to agree on the terms, this dispute is not unlike other contract disputes that underlie many foreclosure lawsuits involving mechanic's liens.

[¶41.] To prove the element of malice required for a slander of title claim, the fact that had to be proven was *not* that Jerry's belief that Stoakes was obligated to pay a share of the already-constructed well was unreasonable or incorrect. Rather, Stoakes had to prove that Jerry in fact knew (or seriously doubted) that he had no legitimate basis to file a mechanic's lien to recover a portion of JED's costs for the installation of the well, but did so anyway, to cause harm to Stoakes.[9] The evidence

---

9. Although the validity of JED's mechanic's lien is not an issue before us in this appeal, we note that this lien included language consistent with SDCL 44-9-

(continued . . .)

in this record does not support such a finding. We therefore reverse the circuit

court's ruling in favor of Stoakes on the slander of title claim against JED.

### 2. Whether the circuit court erred in concluding that Bighorn and JED violated SDCL 44-9-22.

[¶42.]     Bighorn and JED argue that the circuit court erred as a matter of law

in applying SDCL 44-9-22 because neither the court's findings nor the evidence

supports an application of that statute under the circumstances. In response,

Stoakes does not appear to dispute that the court erred in determining that *JED*

violated SDCL 44-9-22, presumably because Stoakes never remitted a payment to

JED on its invoice and the statute contemplates a lien being satisfied by payment or

otherwise. However, Stoakes argues that the court correctly determined that

Bighorn violated SDCL 44-9-22 because Bighorn did not, after receiving a check for

full payment on its invoice and a written demand to remove its lien, remove its lien

on Stoakes's property.

[¶43.]     The application of SDCL 44-9-22 hinges on the provisions in SDCL 44-

9-21, which provides:

> Whenever a lien has been claimed by filing the same in the office
> of the register of deeds and it is *afterward satisfied* by payment,
> foreclosure, compromise, or other method, the creditor shall
> execute and deliver to the owner of the property a satisfaction
> describing the lien by its date, date of filing, amount claimed,
> description of the property, and the names of the lien claimants
> and owner of the property. Such satisfaction shall be executed

---

(. . . continued)

> 1, which provides that "[w]hoever shall, at the request of the owner . . .
> furnish skill, labor, services, . . . *for the improvement, development, or
> operation of property* as hereinafter specified, shall have a first lien
> thereon[.]" (Emphasis added.) Whether or how this language may apply to
> the facts of this case was not addressed below.

> before two witnesses or acknowledged before a notary public, and upon presentation to the register of deeds, he shall file the same and cancel the said lien of record.

(Emphasis added.) SDCL 44-9-22 then provides:

> If any holder of a lien under the provisions of this chapter shall neglect to execute and deliver such satisfaction within ten days after written demand therefor by the owner of the property or any person interested therein, when such lien *has in fact been satisfied as provided in § 44-9-21*, he shall be liable to the person demanding such satisfaction for all damages, costs, and expenses, including attorney's fees, and an additional penalty of one hundred dollars.

(Emphasis added.)

[¶44.] The undisputed facts related to Bighorn's lien do not fall within the parameters of these statutes. Because of Jerry's mistaken belief that the lien waiver check provided to Bighorn, if accepted, would preclude his ability to collect the amount due to JED for Stoakes's connection to the water system, this check was never deposited. Jerry filed the lien on behalf of Bighorn after refusing to cash this check. There was no evidence presented at trial, nor did the circuit court enter a finding that this *lien* was "*afterward satisfied* by payment, foreclosure, compromise, or other method." SDCL 44-9-21 (emphasis added).[10] The court therefore erred to the extent it relied on SDCL 44-9-22 as an alternative basis for either an award of damages or attorney fees to Stoakes.

---

10. Although Bighorn did not prevail on its lien foreclosure claim, at the hearing on JED's and Bighorn's motion for a new trial on damages or, in the alternative, to dismiss the slander of title claims, the parties agreed that Bighorn is entitled to the $31,728 payment that had been tendered, but refused. At the conclusion of the hearing, the circuit court directed the parties' attorneys to ensure this payment was made.

[¶45.]     Because we are reversing the court's ruling on the slander of title claims, we need not address Bighorn's and JED's claim that the circuit court further erred by not reducing the $204,408 awarded for future damages on the slander of title claims to its present value.

### Stoakes's promissory estoppel claim

[¶46.]     By notice of review, Stoakes argues that the circuit court's findings clearly state that the parties had an oral agreement that he would have a one-fifth ownership in the well system or well company in exchange for $24,000. He further asserts that he reasonably and detrimentally "relied on the promise by not digging his own well system, searching for alternatives for water, and paying the agreed upon $35 per month for his usage of the well while connected." Finally, he contends his loss was foreseeable to JED. He therefore argues the court erred in denying him relief on his promissory estoppel claim and on his request for attorney fees related to the claim.

[¶47.]     "Promissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise [will] be performed." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 848 (S.D. 1990). Further, "1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made." *Hahne v. Burr*, 2005 S.D. 108, ¶ 18, 705 N.W.2d 867, 873 (citation omitted). "Estoppel is not applicable if any of these elements are lacking or have not been proven by clear and convincing evidence." *Id.*

[¶48.]    Although not dispositive to the resolution of this claim, we note that there is an inconsistency in the findings of fact and the conclusions of law the circuit court entered regarding Stoakes's promissory estoppel claim.  In one finding of fact, the court found: "Keith and Jerry orally agreed that in exchange for their one-fifth ownership in either the well system or well company, each property owner would pay to Jerry or JED Spectrum $24,000.00 for the cost of implementing the well system."  However, in a conclusion of law entered on Stoakes's promissory estoppel claim, the court concluded "that the parties never came to an agreement on the shared well[.]"  In so concluding, the court relied on the lack of a "meeting of the minds on the terms of the agreement."  While both of these statements, although inconsistent, relate to the parties' breach of contract claims, there is no meeting of the minds requirement that must be met to prove a claim of promissory estoppel.  It appears the court was intermingling the requirements relating to these separate claims.

[¶49.]    Nevertheless, a review of the record supports the circuit court's denial of relief on Stoakes's promissory estoppel claim.  Stoakes did not establish by clear and convincing evidence that any detriment he suffered by relying on Jerry's oral promise was substantial in an economic sense.  While Stoakes did not acquire a one-fifth ownership in JED's well system, he also never paid the $24,000 to JED.  He is thus in the same position he would have been in had Jerry never made the promise on JED's behalf.  Prior to the promise, Stoakes would have had to construct his own well or find a reliable water source through other means.  Importantly, promissory estoppel sounds in equity, and because Stoakes did not pay JED the purported

agreed-upon $24,000 (one-fifth of what JED had to pay to construct the well system), it would be inequitable to require JED to pay Stoakes ($62,000 + $8,555.48 in prejudgment interest) in damages for what it would cost Stoakes to construct his own well. We conclude that the circuit court did not err in denying Stoakes relief on his promissory estoppel claim against JED.

[¶50.] In light of this ruling, there is no need to address Stoakes's challenge to the circuit court's associated ruling denying an award of attorney fees related to this claim.

## Conclusion

[¶51.] We reverse the circuit court's order and judgment in favor of Stoakes on the slander of title claims and affirm the court's order denying Stoakes's promissory estoppel claim. We also affirm the court's judgment for attorney fees in favor of Stoakes in the amount of $33,394.20.[11] Given these rulings, we also deny Stoakes's request for appellate attorney fees.

[¶52.] Reversed in part and affirmed in part.

[¶53.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.

---

11. JED and Bighorn have not, in this appeal, asked this Court to reduce the attorney fees the circuit court awarded to Stoakes in conjunction with both his defense of the mechanic's lien foreclosure and his prosecution of the slander of title claims. The court awarded the fees under both SDCL 44-9-22 and SDCL 44-9-42. While we have determined that the court erred in applying SDCL 44-9-22, the court's authority to "allow such attorney's fees . . . and other expenses" to Stoakes under SDCL 44-9-42 was well within its discretion.